*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0237p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee/Cross-Appellant,*

          *v.*

A. WILLIAM ERPENBECK, JR.,
          *Defendant-Appellant/Cross-Appellee.*

Nos. 06-4247/4248/4386/4389

>

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
Nos. 03-00050; 04-00018—Sandra S. Beckwith, Chief District Judge.

Argued: April 23, 2008

Decided and Filed: July 2, 2008

Before: GILMAN, ROGERS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Eric W. Richardson, VORYS, SATER, SEYMOUR & PEASE LLP, Cincinnati, Ohio, for Appellant. Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Eric W. Richardson, Glenn V. Whitaker, Michael J. Bronson, VORYS, SATER, SEYMOUR & PEASE LLP, Cincinnati, Ohio, for Appellant. Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

GILMAN, J., delivered the opinion of the court, in which McKEAGUE, J., joined. ROGERS, J. (p. 18), delivered a separate opinion concurring in all of the majority opinion except for part II.C.1.b, the last sentence of part II.E.2 and part II.E.3.b.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. A. William Erpenbeck, Jr. pled guilty to one count of bank fraud, in violation of 18 U.S.C. § 1344. Before he was sentenced, he also pled guilty to participating in a conspiracy to obstruct justice by interfering with his sentencing proceeding, in violation of 18 U.S.C. § 371. The court then sentenced Erpenbeck to 300 months of imprisonment for bank fraud with a concurrent sentence of 60 months for obstruction of justice. This resulted in a final sentence that was 65 months above the district court's calculation of the applicable Guidelines range for the bank-fraud charge.

1

Erpenbeck argues on appeal that his sentence is procedurally and substantively unreasonable and that the district court violated Rule 32(h) of the Federal Rules of Criminal Procedure by failing to provide him with proper notice that it was considering an upward departure. The government has conditionally cross-appealed, arguing that if we find that a resentencing is warranted, we should correct the district court's Guidelines determination as to the amount of actual loss and the number of victims. The government made clear in its briefs and at oral argument, however, that if we conclude that Erpenbeck's arguments are without merit, the government waives all of the issues raised in its cross-appeal. Because of our conclusion that Erpenbeck's arguments are without merit, and that any errors made by the district court in calculating Erpenbeck's sentence either militate in Erpenbeck's favor or are harmless, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Erpenbeck was the president of Erpenbeck Development Company and its affiliated companies (EDC). EDC, located in Edgewood, Kentucky, was once one of the largest developers of single-family homes and condominiums in the greater Cincinnati and northern Kentucky region. Erpenbeck's sister, Lori Erpenbeck, worked as a bookkeeper for EDC until January of 2002.

To finance its building program, EDC obtained construction loans from FDIC-insured banks. According to EDC's agreements with its construction lenders, EDC was supposed to pay the appropriate lender the portion of the construction loan applicable to each home or condominium when the property was sold. EDC's closing agent would utilize the closing proceeds to prepare a check in the agreed amount made payable to the construction lender. The check was then to be given to the construction lender so that the home buyer would take his or her property free of the construction lien (i.e., subject only to any long-term mortgage that might have been arranged by the buyer). If the construction lender was not paid, however, the buyer's house was saddled with two liens (the construction lien and the mortgage) and the buyer's mortgage was junior to the construction lien.

From 1999 until about March of 2002, EDC's spending exceeded its income. Erpenbeck and EDC's closing agents responded to this cash squeeze by depositing buyers' closing checks into EDC's own accounts rather than having the agents first disburse the proper amounts to the construction lenders. Many checks were diverted to EDC accounts at either Firstar Bank or People's Bank of Northen Kentucky (PBNK). On some occasions, where buyers paid cash and no permanent lender was involved, Erpenbeck or EDC employees simply used the cash for EDC's benefit.

EDC began to refer to the money that it received from buyers but did not apply to the construction loans as "holds" or "held loans." To prevent the construction lenders from discovering that a property had been sold and that a lien payoff was due to the lender, Erpenbeck and EDC employees continued to make interest payments on the loans. Homeowners often did not discover that a construction lien was still on their homes until they attempted to sell or refinance. When such a homeowner contacted EDC, EDC would quickly pay off the loan and clear the title, explaining to the buyer that the remaining lien was the result of a paperwork error.

In addition to the held-loan scheme, Erpenbeck, along with PBNK officers John Finnan and Mark Menne, submitted false reports to other lenders in order to obtain additional loans for EDC. The men secured the loans by lying about the equity in EDC's development projects. In one instance, Erpenbeck obtained a loan from another bank by submitting a false statement of construction work. He went so far as to install fake manhole covers in the streets of a development to obtain a draw for a sewer system that did not exist.

Finnan and Menne also solicited other banks to purchase approximately $20 million worth of PBNK's construction loans to EDC. The government asserts that the men further conspired with

Erpenbeck to obtain funds for EDC's operating accounts for the purpose of allowing Erpenbeck to cover EDC's various overdrafts, and that Finnan and Menne made the held-loan scheme possible by instructing PBNK employees to permit EDC to deposit checks into its own accounts that were made payable to other construction lenders.

In January of 2002, Provident Bank, one of the banks that had lent EDC money, discovered that EDC had sold 9 of 13 units in a Provident-financed project but had not paid off any of the construction loans. Soon other banks began to make similar discoveries. Erpenbeck met with the banks, pled accounting problems, and asked for additional time to pay off the loans. Finally, on March 22, 2002, Jim Hass, a former financial officer at EDC, informed Firstar Bank about the held-loan scheme at EDC. Erpenbeck turned himself in to the FBI that same day.

By the time Erpenbeck turned himself in, EDC had illegally diverted a total of $33.9 million. The scheme eventually defrauded 8 federally insured construction lenders, 32 other federally insured financial institutions that provided mortgage loan financing for the individuals who bought EDC properties, and a total of 260 individuals who purchased EDC properties on which the construction liens were not removed. When Erpenbeck's fraud was discovered, 224 individuals still had construction liens on their homes that totaled approximately $26 million. The government alleges that many individual homeowners suffered emotional distress, in addition to potential financial loss, upon discovering that they could lose their homes because of the construction liens.

After the fraud was discovered, the Federal Deposit Insurance Corporation (FDIC) began to investigate PBNK. PBNK was eventually required to charge off more than $6 million in loans to EDC and over $5 million in loans to Erpenbeck and his family members. The investigation also uncovered the $20 million in EDC loans that Finnan and Menne had persuaded other banks to buy. As a result of the scandal and the FDIC investigation, PBNK's board of directors sold PBNK to the Bank of Kentucky in order to keep it from closing outright.

Individuals with construction liens on their homes who had financed their purchase with a long-term mortgage also took action by bringing a class-action lawsuit against PBNK. The construction liens at issue in the lawsuit were ultimately released through a settlement agreement, referred to as the "Mitchell settlement." As part of the Mitchell settlement, PBNK put approximately $16.8 million into an escrow account. Money from the escrow account was then distributed to the construction lenders who had been defrauded by Erpenbeck's held-loan scheme. The construction lenders then discharged the liens on the homes of the individual homeowners defrauded by Erpenbeck. Five million of the $16.8 million settlement was paid by PBNK's insurance, $4 million was paid by various agents and title insurers, and the balance of the settlement, nearly $8 million, was paid by PBNK.

The class-action lawsuit settled only those liens where the homeowner had financed his or her home through a permanent lender. Individuals who paid cash for their homes were not included in the settlement. This partially explains the difference between the $16.8 million settlement and the approximately $26 million in total liens that were unpaid as of March 2002. In addition to the payments that various construction lenders received as part of the Mitchell settlement, each of them foreclosed on EDC property that had been pledged as collateral for the construction loans.

Erpenbeck was charged with and later pled guilty to bank fraud. He was released on bond in April of 2003. The government intended to call Erpenbeck's sister, Lori, to testify at his sentencing hearing in order to refute Erpenbeck's assertion that Lori was actually the person responsible for the fraud. On February 2, 2004, Erpenbeck's father, Anthony Erpenbeck, and Erpenbeck met with Lori in an attempt to persuade her to testify at the hearing in a way that would minimize Erpenbeck's culpability. Following the initial meeting, Lori contacted the FBI and wore a wire to additional meetings with Anthony and Erpenbeck. Her father and brother attempted to

persuade Lori to say that she was responsible for the fraud, urged her to break down in tears on the witness stand, and informed her that they would help her financially if she testified as they requested.

The FBI arrested Erpenbeck and his father after a meeting with Lori on February 5, 2004. A grand jury indicted Erpenbeck and his father that same month for conspiracy to obstruct an official proceeding and on five related counts. Erpenbeck eventually entered into a plea agreement calling for him to plead guilty to one count of conspiracy to obstruct justice, with the related counts to be dismissed.

District Judge S. Arthur Spiegel sentenced Erpenbeck on the charges of bank fraud and conspiracy to obstruct justice in April of 2004 under the 2001 version of the Guidelines. He determined that Erpenbeck had caused an estimated $26 million in loss to more than 50 victims, which called for an offense level of 32 under the Guidelines. Judge Spiegel then added sentencing enhancements of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(8)(C) because the offense involved sophisticated means, 2 levels pursuant to U.S.S.G. § 3B1.3 because Erpenbeck abused a position of trust, 4 levels pursuant to U.S.S.G. § 2B1.1(b)(12)(B) for jeopardizing the safety and soundness of a financial institution, 4 levels pursuant to U.S.S.G. § 3B1.1(a) for leading five or more participants in a crime, and 2 levels pursuant to U.S.S.G. § 3B1.3 for obstruction of justice. Although Judge Spiegel denied Erpenbeck's request for downward departures based on acceptance of responsibility and on assistance to the government, he granted a 4-level downward departure in recognition of his past contributions to the community. This brought Erpenbeck's total offense level down to 42, and his sentencing range was determined to be between 360 months and life in prison.

Judge Spiegel then sentenced Erpenbeck to a 360-month term of incarceration on each count of conviction (the statutory maximum), with the terms to run concurrently. After sentencing, the parties discovered that confusion over the plea agreement had led the court to mistakenly believe that the maximum penalty for the conspiracy-to-obstruct-justice charge was 360 months. This mistake is not relevant to the present appeal, however, because Erpenbeck's first sentence was vacated and his case remanded for resentencing in September of 2005 pursuant to *United States v. Booker*, 543 U.S. 220 (2005).

After the case was remanded, Erpenbeck moved to disqualify Judge Spiegel from resentencing him. His motion was denied, but Erpenbeck's case was eventually transferred to Chief District Judge Sandra S. Beckwith for other reasons. Judge Beckwith resentenced Erpenbeck in August of 2006 under the 2001 version of the Guidelines.

Performing the sentencing calculations anew, Judge Beckwith determined that the actual loss under the Guidelines was $7.9 million (as opposed to the prior calculation of $26 million) after the loss had been reduced by the collateral collected by the banks and the money paid to the construction lenders from the Mitchell settlement. This called for an offense level of 26 under the Guidelines. She then applied sentencing enhancements of 4 levels pursuant to U.S.S.G. § 2B1.1(b)(12)(B) for jeopardizing the safety and soundness of a financial institution, 4 levels pursuant to U.S.S.G. § 3B1.1(a) for leading five or more participants in a crime, and 2 levels pursuant to U.S.S.G. § 3B1.3 for obstruction of justice. The judge also denied Erpenbeck's U.S.S.G. § 5K2.0 motion for a downward departure for substantial assistance and refused to grant Erpenbeck any credit for acceptance of responsibility. As a result, Erpenbeck's total Guidelines offense level was set at 36 and his sentencing range was determined to be between 188 to 235 months in prison.

After acknowledging the advisory nature of the Guidelines, discussing the 18 U.S.C. § 3553(a) factors, and noting the extent of harm caused by Erpenbeck's actions, Judge Beckwith decided on a bank-fraud sentence five months above the Guidelines range. She stated that "an addition of 5 months above the top of the Guidelines range for the bank fraud to 240 months is

appropriate in this case, together with a consecutive sentence of 60 months on the obstruction of justice charge." Erpenbeck's counsel, however, objected to the consecutive nature of the two sentences, arguing that the Guidelines prohibited consecutive sentences for fraud and conspiracy to obstruct justice under the circumstances of the case. After conceding that "the Guidelines and statutes are not a model of clarity with regard to what can and cannot be imposed consecutively," Judge Beckwith stated that she "nevertheless, believe[d] that a sentence at the 300-month point is the appropriate one." This was consistent with an earlier statement she had made at the sentencing hearing that "a sentence of 300 months on the bank fraud in this case will not create an unwarranted sentencing disparity among similarly situated defendants." She thereupon amended the sentencing order to 300 months for the charge of bank fraud—an upward variance of 65 months of imprisonment above the calculated Guidelines range—with a concurrent sentence of 60 months of imprisonment for the obstruction-of-justice charge. This timely appeal followed.

## II.  ANALYSIS

### A.     Standard of review for sentencing determinations

A district court's sentencing determination is reviewed "under a deferential abuse-of-discretion standard" for reasonableness, which has both a procedural and a substantive component. *Gall v. United States*, 128 S. Ct. 586, 592, 597 (2007). We must first ensure that the district court committed no procedural error. *Id*. at 597; *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005). A district court necessarily abuses its sentencing discretion if it "commit[s] [a] significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 128 S. Ct. at 597.

If the district court's sentencing decision is procedurally sound, we must "then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard[,] . . . tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* For sentences within the Guidelines range, we may apply a rebuttable presumption of substantive reasonableness. *Id.*; *Rita v. United States*, 127 S.Ct. 2456, 2462 (2007); *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006). We may not, however, apply "a presumption of unreasonableness" to sentences outside of the Guidelines range. *Gall*, 128 S. Ct. at 597. If the sentence departs from the Guidelines, we must give "due deference" to the district court's decision that the § 3553(a) factors justify the variance. *Id.* "The fact that [this court] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.*

### B.     Procedural reasonableness as it relates to Guidelines calculations

As this court has explained, the first step of a review for procedural reasonableness requires us to determine if the district court "properly calculated the applicable advisory Guidelines range." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). In order to understand Erpenbeck's argument that the district court miscalculated the Guidelines range, we must first review how loss is calculated under the Guidelines. Financial loss for the crime of fraud is calculated under U.S.S.G. § 2B1.1, which "occupies four pages in the Sentencing Manual, followed by sixteen pages of application notes." *United States v. Ravelo*, 370 F.3d 266, 274 (2d Cir. 2004) (Raggi, J., concurring in part and concurring in the judgment). A court attempting to apply § 2B1.1 to the crime of fraud begins with a base-offense level of 6. U.S.S.G. § 2B1.1(a). The offense level is then increased based on the amount of loss resulting from the fraud. U.S.S.G. § 2B1.1(b)(1). For example, a loss

of more than $7 million results in a 20-level increase, while a loss of more than $20 million results in a 22-level increase. *Id.*

Actual loss is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, Application Note 2(A). Reasonably foreseeable pecuniary harm means "the pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* Pecuniary harm is defined as harm that is "monetary or that otherwise is readily measurable in money." *Id.*

Once the amount of actual loss is established, that amount is to be reduced by both (1) the amount paid by the defendant to his victims *before* the fraud was discovered, and (2) the amount of collateral that has been collected *at the time of sentencing*. U.S.S.G. § 2B1.1, Application Note 2(E). Application Note 2(E) specifically states that loss "shall be reduced by" any money returned or the "fair market value of the property returned . . . by the defendant or other persons acting jointly with the defendant . . . before the offense was detected," and that "[i]n a case involving collateral pledged or otherwise provided by the defendant, [the amount of loss shall be reduced by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."

The Guidelines then call for enhanced offense levels depending on the number of victims who suffered "any part of the actual loss." U.S.S.G. § 2B1.1(b)(2), Application Note 3(A)(ii). No enhancement applies if the number of victims is under 10. U.S.S.G. § 2B1.1(b)(2)(A). If the number of victims is between 10 and 50, a 2-level enhancement applies, and 4 levels are added if the number of victims is 50 or higher. U.S.S.G. § 2B1.1(b)(2)(A) & (B).

After the *Booker* remand, Judge Beckwith disagreed with Judge Spiegel's Guidelines calculations and found that the amount of actual loss totaled $7.9 million. This calculation resulted in a base-offense-level increase of 20 for the amount of loss as opposed to an increase of 22 levels under Judge Spiegel's calculations. *See* U.S.S.G. § 2B1.1(b)(1). The key reason for the difference of view was Judge Beckwith's determination that only the eight construction lenders were the "victims" of Erpenbeck's crime under § 2B1.1(b)(2)(A), Application Note 3(A)(ii) (i.e., only the construction lenders suffered any "actual loss" because the construction liens on individual homes were eventually cleared).

In reaching the $7.9 million of actual loss, Judge Beckwith accepted the government's assertion that the lenders holding construction loans were owed approximately $33 million. But she then subtracted from that amount (1) approximately $7 million that Erpenbeck paid on his loans before the fraud was discovered, and (2) approximately $18 million that the construction lenders received through both the sale of collateral and the Mitchell settlement. This left a total of $7.9 million in actual loss.

Judge Beckwith declined to impose an enhancement based on the number of victims because she determined that, given her conclusion that only the lenders suffered an actual loss, the Guidelines prohibited her from finding that the homeowners were victims. As a result, she concluded that the number of victims was fewer than 10 (i.e., only the 8 construction lenders). *See* U.S.S.G. § 2B1.1(b)(2). Erpenbeck's final offense level thus fell from 42 at his first sentencing to 36 at resentencing. Finally, Judge Beckwith rejected the government's arguments that (1) the Mitchell settlement should be counted against Erpenbeck as part of the actual loss incurred by PBNK or, at the very least, should not be credited to Erpenbeck to reduce the amount of actual loss incurred by other lenders who received funds from the Mitchell settlement, and (2) the amount of intended loss was higher than the court's calculation for actual loss, so the court should have used the intended loss to determine the final amount of loss under U.S.S.G. § 2B1.1(b)(1).

Addressing the Mitchell settlement, Judge Beckwith commented as follows:

> While the net amount paid to settle Mitchell, and amounts paid to participating banks when PKNB was sold may be relevant to calculating restitution, the Court finds that these amounts are not properly included in the "actual loss" calculation for Guidelines purposes. PBNK's chief officers, Finnan and Menne, were willing and active participants in Defendant's larger fraudulent scheme . . . . [T]he court is unable to conclude, based on a preponderance of the evidence in the record, that the Mitchell settlement should be included as an "actual loss" for the purpose of calculating this Defendant's advisory Guidelines range.

She did not address the government's alternative argument that the money paid to the construction lenders out of the Mitchell settlement should at the very least not be used to reduce the amount of loss.

As for intended loss, Judge Beckwith determined that, because there was significant collateral on all of the loans to the eight construction lenders, and because Erpenbeck was attempting to temporarily resolve his cash-flow problem rather than permanently defraud the homeowners, Erpenbeck did not subjectively intend to cause significant pecuniary harm to either the construction lenders or the individual homeowners. On that basis, she reasoned that Erpenbeck's "subjective intent" to defraud was not "sufficiently weighty to support a conclusion that the intended loss was significantly more than the actual loss that was sustained."

## C.     Erpenbeck's Guideline-related arguments

Erpenbeck's first argument on appeal is that his sentence is procedurally unreasonable because Judge Beckwith improperly calculated his Guidelines range. Specifically, Erpenbeck asserts that the judge erred in (1) miscalculating the actual loss as over $7 million ($7 million being an offense-level breakpoint), (2) freezing the record at resentencing, thereby ignoring additional collateral collected by the construction lenders afterwards, and (3) enhancing his Guidelines range by 4 levels for jeopardizing the safety and soundness of a financial institution, pursuant to U.S.S.G. § 2B1.1(b)(12)(B), and by 4 levels for leading five or more participants in a crime, pursuant to U.S.S.G. § 3B1.1(a). Erpenbeck also argues that his sentence is procedurally unreasonable because Judge Beckwith failed to properly consider the § 3553(a) factors. Our analysis regarding each of Erpenbeck's arguments follows.

### 1.     Loss calculation

The amount of loss under the Guidelines is to be determined by a preponderance of the evidence. *United States v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2004). We will not set aside a district court's determination of that amount unless clearly erroneous, *United States v. Sosebee*, 419 F.3d 451, 455 (6th Cir. 2005), but we will review its methodology for calculating the loss de novo. *Rothwell*, 387 F.3d at 582. Whether the "facts as determined by the district court warrant the application of a particular guideline provision" is a legal question that we also review de novo. *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006) (internal quotation marks omitted).

### a.     Loss is over $7 million

Erpenbeck argues that the actual loss resulting from the fraud offense is no more than $6.9 million. The distinction between the $7.9 million in loss found by Judge Beckwith and the $6.9 million in loss put forth by Erpenbeck is significant because, if the loss falls below $7 million, Erpenbeck's offense level will increase by 18 levels rather than 20 levels. *See* U.S.S.G. § 2B1.1(b)(1). Specifically, Erpenbeck argues that Judge Beckwith erred because she miscalculated the loss incurred by Bank One. He asserts that Bank One incurred no net loss at all because,

although approximately $3.7 million in payments on construction loans were withheld from Bank One, the bank received approximately $3.5 million in collateral and another $2.2 million from the Mitchell settlement to offset those losses.  As a result, Erpenbeck contends, Bank One actually received a net gain.

We are not persuaded by Erpenbeck's argument.  The record clearly shows that Bank One was owed a total of at least $6.9 million in construction loans when the fraud was discovered.  And a footnote in the district court's Guidelines calculations indicates that two additional outstanding Bank One loans were later reported by the bank in a letter to the court and were not included in the total loan amount.

Erpenbeck also mistakenly assumes that all of the collateral that he put up for the  $6.9 million in loans he took out from Bank One must be credited solely toward the $3.7 million that he fraudulently diverted from the bank, as opposed to being prorated over the total amount of the loan.  The loan, however, was secured by both Erpenbeck's collateral and by the liens that Bank One held on individual homes.  Bank One could have foreclosed on the individual homes to make up the difference in what Erpenbeck owed to it, so there is no reason why the value of EDC's collateral should be credited only against the amount fraudulently diverted.  Because the Bank One calculation is the primary evidence put forth by Erpenbeck as proof that Judge Beckwith erred in calculating the amount of loss as over $7 million, and because we conclude that this argument has no merit, Judge Beckwith did not err in finding that the actual loss was over $7 million.

### b.  Any mistake in the calculation of loss militates in Erpenbeck's favor

We also note that Judge Beckwith underestimated the amount of loss under the Guidelines methodology.  The district court reduced the amount of actual loss caused by Erpenbeck by giving him credit for money paid to construction lenders out of the Mitchell settlement, but the Guidelines do not provide for a reduction in actual loss caused by a defendant based on the contribution of a third party.  Application Note 2(E)(ii) to U.S.S.G. § 2B1.1(b)(1) provides that "[i]n a case involving collateral pledged or otherwise provided by the defendant, [the amount of loss shall be reduced by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."  This language authorizes only *collateral* to be used to reduce loss, and the money that the construction lenders received as part of the Mitchell settlement was not from collateral provided by Erpenbeck. *See United States v. Castellano*, 349 F.3d 483, 484 (7th Cir. 2003) (holding that a third-party source of recovery cannot be used to reduce the amount of actual loss inflicted by a defendant under the Guidelines simply because this alternative source of recovery became available).

Erpenbeck's loss-related arguments are therefore without merit, and he should consider himself fortunate that the district court miscalculated the amount of loss in his favor.  Because any infirmity in the court's loss calculation weighs in favor of Erpenbeck, and because the government has agreed to waive its loss-related arguments if we find that Erpenbeck's arguments are without merit, we will not disturb the district court's calculation of actual loss. *See United States v. Gray*, 521 F.3d 514, 543 (6th Cir. 2008) (affirming a district court's calculation of loss under the Guidelines, even in the face of an error, because "there [was] strong evidence" that the loss caused by the defendant was actually greater than the loss calculated by the district court, so that any error militated in favor of the defendant).

### 2.  Freezing the record

Erpenbeck's second Guidelines argument is that Judge Beckwith erred in freezing the record as to the loss incurred by the construction lenders as of the time of his original sentencing in April

of 2004. The government argues that Erpenbeck waived this argument on appeal by raising it cursorily in a footnote and failing to develop the argument in his principal brief. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) (refusing to address a party's argument because the argument was raised only in a single footnote and was not otherwise developed in the initial brief). Although Erpenbeck's argument is indeed "bare bones," we conclude that it is not so undeveloped as to constitute a waiver. We will therefore address this argument on its merits.

Regarding the merits, the government contends that *United States v. Worley*, 453 F.3d 706, 709-10 (6th Cir 2006), makes clear that facts that occur after the original sentencing are irrelevant to a resentencing court. In *Worley*, this court refused to consider on resentencing the defendant's post-sentence conduct and efforts at rehabilitation. The court agreed with the Seventh Circuit that "[t]he goal of the [*Booker*] remand is to determine if, at the time of sentencing, the district judge would have imposed a different sentence in the absence of mandatory guidelines. Post-sentencing events or conduct simply are not relevant to that inquiry." *Id.* at 709 (quoting *United States v. Re*, 419 F.3d 582, 584 (7th Cir. 2005)) (second alteration in original). Although Erpenbeck does not cite a single case in support of his argument, he asserts in his reply brief that *Worley* is inapposite because the resentencing court engaged in new factfinding and calculated a new offense level for loss, rather than simply imposing a different sentence on the basis that the Guidelines were advisory.

Contrary to Erpenbeck's assertions, however, Judge Beckwith did *not* find any new facts related to loss; she simply interpreted the language of the Guidelines governing actual loss differently. Judge Beckwith considered Erpenbeck's request for a new Presentence Report (PSR), but found that it was "fair to both parties to resentence [Erpenbeck] on the exhaustive record that exist[ed] as of the date of the original sentencing." She also noted that "it has not been the practice of this Court to order new presentence reports on *Booker* remands, and Erpenbeck presents no reasons that he should be a special case."

The record further shows that Judge Beckwith properly followed the Guidelines when calculating the amount of collateral by taking into account not only the collateral sold, but also the fair market value of all unsold collateral held by the construction lenders at the time of the original sentencing. *See* U.S.S.G. 2B1.1, Application Note 2(E)(ii). She also reviewed letters from the lenders provided to the court and the PSR figures on the outstanding loss of the lenders, and explicitly noted that Erpenbeck had provided "no reliable evidence that persuad[ed] the court that the actual loss from the EDC loans had been reduced from the March 2002 amount." On appeal, Erpenbeck likewise provides us with no relevant information suggesting that the amount of collateral that should be attributed to him had significantly changed since his original sentencing. We therefore conclude that Judge Beckwith did not err in relying on the 2002 record.

### 3.     *Four-level enhancements*

Erpenbeck's final Guidelines argument is that the district court erred in enhancing his Guidelines range by 4 levels for jeopardizing the safety and soundness of a financial institution, pursuant to U.S.S.G. § 2B1.1(b)(12)(B), and by 4 levels for leading five or more participants in a crime, pursuant to U.S.S.G. § 3B1.1(a). We will address each Guidelines provision in turn.

#### a.     *U.S.S.G. § 2B1.1(b)(12)(B) enhancement*

Section 2B1.1(b)(12)(B) of the 2001 Guidelines provides that if an "offense substantially jeopardized the safety and soundness of a financial institution," an additional 4 levels apply. The enhancement is appropriate "if, as a consequence of the offense, the institution (A) became insolvent; . . . (D) was so depleted of assets as to be forced to merge with another institution in order to continue active operations; or (E) was placed in substantial jeopardy of any of subdivisions (A) through (D)." U.S.S.G. § 2B1.1(b)(12)(B), Application Note 10. Both Judge Spiegel and Judge

Beckwith applied this enhancement on the ground that Erpenbeck's scheme substantially jeopardized the soundness of PBNK, which was forced to merge with the Bank of Kentucky.

Erpenbeck argues that this enhancement was inappropriate because (1) PBNK was already in financial trouble before its involvement with him, (2) PBNK bank officers Finnan and Menne acted on their own accord and independently from Erpenbeck, and (3) Erpenbeck's scheme caused primarily reputational harm to the bank, as opposed to economic harm. Ample evidence in the record, however, shows that PBNK was placed in substantial jeopardy of becoming insolvent and of having to merge because of its officers' efforts to help Erpenbeck cover up the held-loan scheme.

Judge Beckwith specifically found that the actions of Finnan and Menne "contributed directly to the scheme Erpenbeck was directing." She further noted that a government witness testified to Erpenbeck's significant role in the bank-fraud scheme and that an FDIC investigator had explained that the fraud perpetrated by Erpenbeck and the PBNK officers caused PBNK to become so depleted of assets "as to substantially risk insolvency or be forced to merge with another institution." There is also no question that PBNK eventually was forced to merge when the fraud came to light. We thus conclude that Erpenbeck's arguments are without merit, and that the district court did not err in applying the enhancement under U.S.S.G. § 2B1.1(b)(12)(B).

### b.     *U.S.S.G. § 3B1.1(a) enhancement*

Erpenbeck also objects to the district court's enhancement pursuant to U.S.S.G. § 3B1.1(a). That section allows for an enhancement if the defendant is "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Like the enhancement discussed above, this enhancement was applied by both Judge Spiegel and Judge Beckwith. Erpenbeck asserts that § 3B1.1(a) is not applicable because (1) there were not five or more people involved in the scheme, and (2) his cohorts at EDC were involved in a different scheme (the held-loan scheme) than his cohorts at PBNK (defrauding other banks), so that no five individuals were involved in the same scheme. Specifically, Erpenbeck argues that PBNK's officers Finnan and Menne were independently "responsible for their misuse of their positions with PBNK," and that he "was incapable of influencing their criminal conduct with respect to their own bank."

In his plea agreement, however, Erpenbeck's admitted that at least five persons were involved in the fraud. The plea agreement states: "The deposits of diverted checks to the company's operating checking accounts were made by [Erpenbeck], the company's closing representative, the company employee in charge of accounting, and at least two other persons." Moreover, the facts establish that Finnan and Menne were involved in the same broad scheme that Erpenbeck was directing at EDC. Judge Beckwith specifically found that "the participants in the scheme, as directed by [Erpenbeck], decided which of the pay-off checks issued by the closing agents would be forwarded to the construction lenders or diverted to the company's own accounts in order to use the pay-off funds for the company's purposes." PBNK facilitated the scheme by fraudulently cashing checks made payable to other lenders and placing them in EDC's accounts.

Finally, the PSR concluded that Erpenbeck was "the organizer and leader of an offense that involved himself, Lori Erpenbeck, Michelle Marksberry, John Finnan, Mark Menne, and others." Judge Beckwith agreed, and we find no basis to disturb her finding that Finnan and Menee were part of the same scheme that involved Erpenbeck and his employees at EDC. We therefore conclude that the district court did not err in granting an enhancement on that ground.

**D.     Section 3553(a) and the procedural reasonableness of Erpenbeck's 300-month sentence**

Erpenbeck's final challenge to the procedural reasonableness of his sentence concerns Judge Beckwith's allocation of his total sentence between the two counts of his conviction. He asserts that

the district court failed to properly consider the 18 U.S.C. § 3553(a) factors in imposing a sentence 65 months above the Guidelines range it had calculated as applicable. A district court abuses its discretion by "failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 128 S. Ct. 586, 597 (2007). A sentence may be procedurally unreasonable where a "district judge fails to consider the applicable Guidelines range or neglects to consider the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence." *United States v Richardson*, 437 F.3d 550, 553 (6th Cir. 2006) (internal quotation marks omitted). A district court is therefore required to "communicate clearly its rationale for imposing the specific sentence." *Id.* at 554. If it "decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 128 S. Ct. at 597.

Judge Beckwith determined that Erpenbeck's applicable Guidelines range for the bank-fraud charge was 188 to 235 months of imprisonment but, after acknowledging the advisory nature of the Guidelines, concluded that "a fair and appropriate sentence in this matter would require a departure above the Guidelines range." After discussing the grounds for departure articulated in U.S.S.G. § 5K2.3 (addressing extreme psychological injury to victims) and U.S.S.G. § 5K2.5 (addressing property damage or loss), and after taking into account the 18 U.S.C. § 3535(a) factors, Judge Beckwith expressed her belief that a 300-month sentence for bank fraud was appropriate.

She acknowledged that a 300-month sentence "added approximately 28 percent to the length of Mr. Erpenbeck's sentence as calculated under the Guidelines," but found the sentence "appropriate based on the extended nature of the harm and damage by Mr. Erpenbeck's scheme, by the length of time defendant continued to engage in his scheme while at the same time indulging in luxuries and an extravagant lifestyle, and by the necessity of promoting respect for the law." Judge Beckwith further explained that the sentence was warranted because a very large number of victims who were harmed by Erpenbeck's fraud were not accounted for in the Guidelines, "[t]he scope and breadth of Mr. Erpenbeck's fraudulent scheme . . . [was] nothing short of audacious," and she was "not aware of another defendant whose fraudulent activity had caused so much damage to so many people." After noting that the fraud impacted the homes of many individuals, and that a home is "quite often one's greatest asset," Judge Beckwith concluded that "through greed and avarice, this self-centered, amoral egotist took people's dreams as well as their money, and for that, he must be held accountable." Judge Beckwith then allocated the sentence by imposing "an addition of 5 months above the top of the Guidelines range for the bank fraud to 240 months" and adding a consecutive sentence of 60 months on the obstruction-of-justice charge.

After determining that the two sentences could not be imposed consecutively under the Guidelines, however, Judge Beckwith reallocated Erpenbeck's sentence by sentencing him to 300 months of imprisonment for the bank-fraud charge and making the sentence of 60 months of imprisonment for the obstruction-of-justice charge concurrent rather than consecutive. This resulted in a sentence 65 months above the Guidelines range that she had calculated for the charge of bank fraud.

Erpenbeck argues that Judge Beckwith unreasonably added an additional 60 months to his bank-fraud sentence when, moments before, she had declared that an increase of only 5 months above the Guidelines range for the bank-fraud charge was appropriate. In support of his argument, Erpenbeck points to *United States v. Cousins*, 469 F.3d 572 (6th Cir. 2006). This court in *Cousins* found a sentence to be procedurally unreasonable where the district court "failed adequately to explain why [an] upward variance of two months was 'sufficient, but not greater than necessary,' to comply with the purposes of 18 U.S.C. § 3553(a)." *Id.* at 575-76. Specifically, the *Cousins* court

noted that the vague and general nature of the district court's justification for the variance could have just as "easily [been] invoked to justify a variance of one day or ten years." *Id.* at 578.

The government responds by arguing that because Judge Beckwith adequately explained that a sentence of 300 months was appropriate in the present case, there is no practical difference between a 300-month sentence to be served in two *consecutive* terms of 240 and 60 months and the same sentence served with two *concurrent* terms of 300 and 60 months. It also argues that *Cousins* is inapposite because the district court there made many more errors than the district court here—failing to mention the Guidelines range, discuss the defendant's sentencing requests, or elaborate on its reasons for the upward variance. *See Cousins*, 469 F.3d at 578. Finally, the government notes that the Supreme Court's recent decision in *Gall* made clear that even a significant departure could be warranted so long as the sentencing court, "[a]fter settling on the appropriate sentence, . . . adequately explain[s] the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 128 S. Ct. at 597.

We agree with the government that Judge Beckwith "adequately explained" why a 300-month sentence was appropriate. A review of the sentencing-hearing transcript indicates that Judge Beckwith believed from the beginning that a 300-month sentence was appropriate in light of Erpenbeck's conduct. After explaining how she calculated the actual loss and what she believed to be the advisory Guidelines range, Judge Beckwith began her § 3553(a) analysis by stating that she was fashioning a sentence "sufficient but not greater than necessary to achieve the sentencing goals." She then applied the § 3553(a) factors to the circumstances of Erpenbeck's case and, prior to indicating that the sentence on the bank-fraud count would be served consecutively with the sentence on the obstruction-of-justice count, made clear that she believed that a 300-month sentence was appropriate for the charge of bank fraud.

Judge Beckwith in fact specifically concluded "that a sentence of 300-months on the *bank fraud* in this case will not create an unwarranted sentencing disparity among similarly situated defendants." (Emphasis added.). She then stated once again that "a sentence of 300 months does not create an unwarranted disparity." Finally, after indicating that the sentence was going to be divided into a 240-month sentence on bank fraud and a 60-month sentence for obstruction of justice, to be served consecutively, she explained that the "statutory factors discussed previously . . . strongly support the 300-month sentence as sufficient but not greater than necessary." This statement was made before any objection by Erpenbeck's counsel as to the consecutive nature of the sentence.

The record therefore makes clear that Judge Beckwith's analysis at sentencing was aimed at establishing the propriety of a 300-month total sentence. She did not divide the 300 months into discrete and consecutive sentences of 240 months and 60 months until after she completed her § 3553(a) analysis. The fact that Judge Beckwith subsequently reapportioned the 300 months into a 300-month sentence for bank fraud to be served concurrently with a 60-month sentence for obstruction of justice does not make the total sentence of 300 months procedurally unreasonable under the circumstances of the present case.

**E.     Substantive unreasonableness**

Erpenbeck also asserts that his sentence is substantively unreasonable. Specifically, he asserts that his sentence (1) was arbitrary, (2) was based on impermissible departure factors under the Guidelines, (3) was greater than necessary, and (4) fails a proportionality review. We will address each of these arguments in turn.

### 1.     *Erpenbeck's sentence was not arbitrary*

Erpenbeck's first argument is that his sentence was selected arbitrarily. *See United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006) (explaining that a sentence is substantively unreasonable if the judge selects the sentence arbitrarily). This argument is essentially the same argument discussed above in Part II.D.—that the sentence was arbitrary because the judge first discussed imposing a sentence of 300 months to be served in two consecutive terms of 240 and 60 months and then decided that a sentence of two concurrent terms of 300 and 60 months was appropriate. For the same reasons discussed in Part II.D., we conclude that the sentence was not arbitrary.

### 2.     *The sentence was not greater than necessary and was justified based upon the § 3553(a) factors*

Judge Beckwith discussed at length the 18 U.S.C. § 3553(a) factors and fully articulated her reasons under that statute for the 65-month departure. As discussed in Part II.D. above, Judge Beckwith made clear that because she treated only the eight construction lenders as victims, as opposed to the 260 homeowners, and because Erpenbeck's fraud was so extensive, she believed that a 300-month sentence was warranted. We conclude that Judge Beckwith's explanation as to why the above-the-Guidelines sentence was proper under the § 3553(a) factors was sufficient in light of the fact that the suffering and harm experienced by the 260 homeowners was not otherwise accounted for in Erpenbeck's sentencing. Moreover, if this case were remanded for resentencing, Erpenbeck's properly recalculated Guidelines range would likely increase to the point where the 300 months would be near or within the proper sentencing range (i.e., if the Mitchell settlement was not counted or the homeowners were classified as victims, the Guidelines range would go up and the appropriate sentencing range could be as high as 360 months to life in prison).

### 3.     *Guidelines upward departures*

Erpenbeck also argues that his sentence is substantively unreasonably because the district court (1) improperly relied on Guidelines departures for property damage or loss, pursuant to U.S.S.G. § 5K2.5, and for extreme psychological injury to the victims, pursuant to U.S.S.G. § 5K2.3, and (2) improperly evaluated the 18 U.S.C. § 3553(a) factors, resulting in a sentence that was greater than necessary to comply with the purposes of the statute. The Guidelines policy statement on departures, however, makes clear that departures are discretionary and that a sentencing court "may impose a sentence outside the range established by the applicable" Guidelines where there are circumstances of a kind or degree that are "not adequately taken into consideration" under the Guidelines. U.S.S.G. § 5K2.0. When determining whether a departure from the Guidelines range is warranted, a district court must consider the following four questions:

> 1) What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case? 2) Has the Commission forbidden departures based on those features? 3) If not, has the Commission encouraged departures based on those features? 4) If not, has the Commission discouraged departures based on those features?

*Koon v. United States*, 518 U.S. 81, 95 (1996) (citation omitted); *see also United States v. Meeker*, 411 F.3d 736, 746-47 (6th Cir. 2005) (quoting *Koon*).

We review a district court's decision to depart upward under the advisory Guidelines under the same "standards we use to judge the procedural and substantive reasonableness of a variance from any [g]uidelines range." *United States v. Vowell*, 516 F.3d 503, 510 (6th Cir. 2008) (internal quotation marks omitted) (alterations in original). This means that a district court's sentencing determination is reviewed "under a deferential abuse-of-discretion standard" for reasonableness.

*Gall v. United States*, 128 S. Ct. 586, 591 (2007); *United States v. Booker*, 543 U.S. 220, 261-62 (2005). If we find that the district court committed an error, however, a remand is unnecessary if the "error was harmless—*i.e.*[,] any such error 'did not affect the district court's selection of the sentence imposed.'" *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005) (*quoting Williams v. United States*, 503 U.S. 193, 203 (1992)).

### a.    Departure based on U.S.S.G. §5K2.5

Turning first to the departure pursuant to U.S.S.G. § 5K2.5, which addresses property damage and loss, we conclude that Judge Beckwith did not err in finding the section applicable. Section 5K2.5 allows for a departure "[i]f the offense caused property damage or loss not taken into account with the guidelines," and instructs courts to consider the harm that was "intended or knowingly risked" and the extent to which "the harm to property is more serious than other harm caused or risked by the conduct relevant to the offense of conviction."

Judge Beckwith noted that several hundred people suffered the "devastating effect that the unraveling of Mr. Erpenbeck's fraudulent scheme had on the communities he built and sold to unsuspecting homeowners." She also pointed out that subdivisions were left in disrepair, streets and parking lots remained unpaved, and some homeowners were left with acrid waterways instead of the pristine lakes promised and paid for when they bought their homes. Finally, Judge Beckwith noted that Erpenbeck had knowingly risked great financial and emotional harm to the homeowners and that this harm was not properly taken into account under the Guidelines applicable to the crime of bank fraud. Because Judge Beckwith sufficiently justified the departure, she did not err in relying on U.S.S.G. § 5K2.5.

### b.    Departure based on U.S.S.G. § 5K2.3

The upward departure based on U.S.S.G. § 5K2.3, however, is more problematic. Section § 5K2.3 allows for a departure if a "*victim* suffered psychological injury much more serious than that normally resulting from a commission of the offense." (Emphasis added.). As Erpenbeck points out, Judge Beckwith determined that the only "victims" under the Guidelines were the eight construction lenders. She was therefore arguably inconsistent in relying on the psychological harm suffered by the homeowners under U.S.S.G. § 5K2.3 when referring to them as victims.

Courts should interpret statutory language "as a coherent whole and give consistent meaning to terms throughout the statute." *Castro v. United States*, 310 F.3d 900, 902 (6th Cir. 2002). Judge Beckwith therefore erred in failing to give the term "victim" a consistent meaning under both U.S.S.G. § 2B1.1 and U.S.S.G. § 5K2.3. *See United States v. Surratt*, 87 F.3d 814, 820 (6th Cir. 1996) (finding that an upward departure based on U.S.S.G. § 5K2.3 was not warranted because the individuals who suffered psychological injury were not "victims" as defined in the case proffered by the government).

The parties dispute whether Judge Beckwith justified the 65-month-above-the-Guidelines sentence as a Guidelines departure or as a variance under the § 3553(a) factors. Erpenbeck argues that the court relied primarily on the Guidelines departures and that the upward departure is unreasonable because Judge Beckwith relied on an impermissible factor when she increased his sentence due to psychological harm caused to the homeowners. The government responds by insisting that the judge relied primarily upon the § 3553(a) factors when increasing Erpenbeck's sentence above the Guidelines range. We find this dispute largely irrelevant, however, because of our determination that the error was harmless under either theory.

The district court's error in inconsistently applying the term "victim" under the Guidelines is harmless for two reasons. First, as discussed above, Judge Beckwith did not have to base the 65-

month enhancement on the Guidelines-departure factors because the sentence was sufficiently justified based upon the 18 U.S.C. § 3553(a) factors alone.

Second, the error would not result in a lower sentence for Erpenbeck upon resentencing. This is because, were we to reach the government's arguments on cross-appeal, we would conclude that the district court erred in its determination that the homeowners did not qualify as victims under the Guidelines. The Guidelines define "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1(b)(2), Application Note 3(A)(ii). Although Judge Beckwith properly determined that the eight construction lenders suffered an "actual loss" as a result of Erpenbeck's fraud, she erroneously concluded that those lenders were the only victims under the Guidelines. On that basis she rejected the government's request for a 4-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(B). The language of the Guidelines, however, does not prohibit a finding that the homeowners suffered a part of the actual loss and therefore also qualified as "victims" within the meaning of U.S.S.G. § 2B1.1.

Guidelines § 2B1.1, Application Note 3, defines a victim as "any person who sustained *any part of the actual loss* determined under subsection (b)(1)." (Emphasis added.). There is no question that the homeowners here suffered *a part* of the actual loss under the Guidelines when Erpenbeck improperly diverted their money, leaving construction liens on their homes. The fraud here clearly resulted in financial losses, at least initially, to the homeowners. Although the district court, when calculating the amount of loss, had to refrain from double-counting the $26 million that Erpenbeck received from the homeowners and then improperly kept from the construction lenders, the court was not prohibited from recognizing that both the construction lenders and the homeowners were victims who suffered a *part* of the actual loss that Erpenbeck caused.

Erpenbeck argues that the homeowners do not qualify as victims because the liens on their homes were eventually paid off by money from the Mitchell settlement. We respectfully disagree. Just because the homeowners were able to successfully band together in a class-action lawsuit to secure payment of their liens does not erase the fact that they suffered an actual loss (i.e., monetary harm that was reasonably foreseeable to Erpenbeck) as a direct result of Erpenbeck's fraud. The fact that a third party—PBNK—ultimately relieved the homeowners of the actual loss they faced does not eliminate the loss—it simply means that the loss was eventually shifted to someone else.

Finally, we address the argument raised by Erpenbeck, in both his briefs and at oral argument, that *United States v. Yager*, 404 F.3d 967 (6th Cir. 2005), prohibited Judge Beckwith from finding that the homeowners were victims under the Guidelines. In *Yager*, this court addressed the question of whether account holders at a bank qualified as victims under the Guidelines when they were immediately reimbursed by the bank for money that was fraudulently taken from their accounts in a stolen-check scheme orchestrated by Yager. The court determined that account holders who suffered only a momentary loss did not qualify as victims. Specifically, the court found that "[w]hile there may be situations in which a person could be considered a 'victim' under the Guidelines even though he or she is ultimately reimbursed, in situations such as this, where the monetary loss is short-lived and immediately covered by a third party, we do not think that there has been an 'actual loss.'" *Id.* at 971; *see also United States v. Mohammed*, 315 F. Supp. 2d 354, 361-63 (S.D.N.Y. 2003) (concluding that creditcard holders were not victims under the Guidelines where they experienced only a temporary loss because merchants and financial institutions promptly reimbursed them and bore the actual loss).

Although a number of the facts in *Yager* are similar to the facts at issue here, the present case is clearly distinguishable. When a customer of a bank or a creditcard company is defrauded, the customer is generally protected by an agreement that the bank or company will handle any fraud based upon unauthorized charges against the customer's account. A customer who is a victim of creditcard or bank fraud therefore knows that he or she will be immediately reimbursed, and

understands that the bank or company will take complete responsibility for investigating the fraud and recouping the loss. As *Yager* points out, a loss under this type of contractual arrangement is necessarily temporary, and the customers are fully reimbursed. The only victims of fraud under these circumstances are the lenders, not the customers.

In the present case, however, the homeowners had no contract with a third party to cover their loss, nor was the loss short-lived. The homeowners were saddled with many thousands of dollars of debt, often for great lengths of time, while they attempted to have the construction liens removed. Most of the homeowners eventually had to undertake a class-action lawsuit to seek relief. As *Yager* itself acknowledges, there are situations in which "a person could be considered a 'victim' under the Guidelines even though he or she is ultimately reimbursed." *Yager*, 404 F.3d at 971. This is such a case.

Because of our conclusion that Judge Beckwith erred in determining that the Guidelines prohibited her from finding that the homeowners qualified as victims, and because the 65-month-above-the-Guidelines sentence is justified based upon the § 3553(a) factors alone, we conclude that any error from Judge Beckwith's application of U.S.S.G. § 5K2.3 was harmless. Erpenbeck's sentence was therefore not unreasonable on that ground.

### 4.    *Proportionality review*

Erpenbeck's final argument regarding the substantive reasonableness of his sentence is that his sentence fails a proportionality review. Judge Beckwith, however, discussed at length the need to avoid unwarranted sentencing disparity. Because this issue was clearly and properly considered by Judge Beckwith, and because we find no error in the district court's reasoning, we see no need to further address the merits of this issue.

### F.    **Reasonable notice and Rule 32(h)**

Erpenbeck's final argument on appeal is that Judge Beckwith failed to comply with Rule 32(h) of the Federal Rules of Criminal Procedure by not providing him with reasonable notice that she was considering an above-the-Guidelines sentence. The Supreme Court recently held that Rule 32(h) is not applicable to upward variances granted pursuant to 18 U.S.C. 3553(a). *Irizarry v. United States*, --- S. Ct.---, 2008 WL 2369164 (U.S. June, 12, 2008). Rule 32(h) continues to apply, however, to upward departures under the Guidelines. *Id.* at *4. We therefore address Erpenbeck's Rule 32(h) argument only insofar as it applies to the district court's reliance on the grounds for upward departure identified in U.S.S.G. § 5K2.

Rule 32(h) provides that

> "[b]efore the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure."

Fed. R. Crim. P. 32(h). Only "reasonable notice" is required, and what constitutes reasonable notice will vary depending on the circumstances of the particular case. *United States v. Meeker*, 411 F.3d 736, 744 (6th Cir. 2005) (explaining that only "reasonable notice" is required to satisfy Rule 32(h); *see also United States v. Quinlan*, 473 F.3d 273, 279-80 (6th Cir. 2007) (holding that notice was reasonable although the district court departed upward without informing the defendant in advance because the government had put the defendant and the court on notice that it was recommending an above-the-Guidelines sentence); *United States v. Ragland*, 226 F. App'x 507, 510-11 (6th Cir. 2007) (holding that Rule 32(h) was satisfied even though no written notice of any specific grounds for

departure was provided to the defendant because the defendant knew that the grounds for departure relied upon by the court had been brought to the court's attention and the court had heard testimony about the circumstances surrounding the grounds for departure); *United States v. Hernandez*, 251 F.3d 1247, 1252 (9th Cir. 2001) (holding that the district court gave reasonable notice by stating its intention to depart upwards at the beginning of the sentencing hearing, even though "neither the [PSR] nor the government's sentencing memorandum identified factors warranting a departure").

We review the district court's actions on this issue for plain error because Erpenbeck failed to raise below the argument that the court failed to provide sufficient notice under Rule 32(h). *See United States v. Cousins*, 469 F.3d 572, 580 (6th Cir. 2006) (holding that this court reviews a district court's failure to provide notice under Rule 32(h) for plain error where the defendant fails to object to the lack of notice at trial). Plain-error review requires us to determine whether (1) there was an error, (2) the error was "obvious or clear," (3) the error affected the defendant's substantial rights, and (4) "this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006) (internal quotation marks omitted)

Erpenbeck correctly notes that the PSR in the present case did not recommend an above-the-Guidelines sentence. Furthermore, as discussed in Part II.E.3.b. above, the district court's reliance upon U.S.S.G. § 5K2.3 as a ground for upward departure was somewhat problematic. Erpenbeck's 300-month sentence is nonetheless justified under § 3553(a) alone, as explained in Part II.E.2. And because Rule 32(h) does not apply to upward variances per *Irizarry*, the sentence was validly imposed even if the notice were to be deemed insufficient. Erpenbeck, in sum, is unable to demonstrate that the alleged error "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Gardiner*, 463 F.3d at 459 (internal quotation marks omitted). We therefore conclude that any error related to Rule 32(h)'s notice requirement, if indeed there was an error, was harmless.

## III.  CONCLUSION

Because (1) the arguments raised by Erpenbeck in his appeal have no merit, (2) any errors committed by the court at sentencing were either harmless or militated in Erpenbeck's favor, and (3) the government has agreed to waive the arguments in its cross-appeal in the absence of a remand, we **AFFIRM** the judgment of the district court.

---

**CONCURRENCE**

---

ROGERS, Circuit Judge, concurring. I concur in all of the majority opinion except for part II.C.1.b, the last sentence of part II.E.2, and part II.E.3.b. These parts conclude that the district court erred below in the defendant's favor. The Government, however, commendably conditioned its cross-appeal: if the court of appeals rejects the defendant's arguments on appeal, the Government would forgo its cross-appeal. Because we do reject defendant's arguments on appeal, the issues presented by the Government's cross-appeal have been withdrawn, and we should not reach out to address them.

It is true that part II.E.3.b accepts the Government's argument that the homeowners were victims under U.S.S.G. § 2B1.1(b)(2) as part of an analysis rejecting defendant's challenge to the district court's alleged reliance on U.S.S.G. § 5K2.3 (psychological harm to victims) to impose a sentence 65 months beyond the guideline range. But the Government's § 2B1.1(b)(2) argument is not necessary to uphold the additional 65 months. We need not decide whether the district court erred in applying § 2B1.1(b)(2), nor is it necessary for us to decide whether the word "victim" means the same thing under § 5K2.3 (dealing with departures in general) as it does in § 2B1.1(b)(2) (dealing strictly with "basic economic offenses" such as theft and fraud). I would not reach out to decide either of these issues.

It is clear from the sentencing transcript that the district court viewed the additional 65 months as a variance justified under the § 3553(a) factors. Although the district court reasoned that a §5K2.3 upward departure was justified, the court did not discuss adding specific amounts of time to Erpenbeck's guidelines sentence until after it had begun a thorough discussion of the § 3553 factors. After stating the intention to add a total of 65 months to Erpenbeck's sentence, the court stated, "This adds approximately 28 percent to the length of Mr. Erpenbeck's sentence as calculated under the Guidelines, and the Court finds this to be appropriate based on the extended nature of the harm and damage caused to Mr. Erpenbeck's scheme, by the length of time defendant continued to engage in his scheme while at the same time indulging in luxuries and an extravagant lifestyle, and by the necessity of promoting respect for the law." Even if the added 65 months could nonetheless be considered a departure under § 5K of the Guidelines, the district court at the very least provided an alternative rationale for the same 65 months under § 3553. Any technical error in relying upon § 5K2.3 would therefore be facially harmless. *See United States v. Lalonde*, 509 F.3d 750, 765 (6th Cir. 2007).