*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0183p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
　　　　　　　　　　*Plaintiff-Appellee,*

　　　v.

CEDRICK STUBBLEFIELD, LATOREY EARVIN,
and BRANDON SPIGNER,
　　　　　　　　　　*Defendants-Appellants.*

Nos. 10-3587/3588/3589

_____

Appeals from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 09-00333—Patricia A. Gaughan, District Judge.

Decided and Filed: June 19, 2012

Before: GILMAN, ROGERS, and STRANCH, Circuit Judges.

_____

## COUNSEL

_____

**ON BRIEF:** Vanessa F. Malone, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, Mariela F. Serrano, Cleveland, Ohio, John B. Gibbons, Cleveland, Ohio, for Appellants. Gregory C. Sassee, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge. Appellants Cedrick Stubblefield, Brandon Spigner, and Latorey Earvin were part of a conspiracy that created false driver's licenses using the genuine identity information of others in order to cash counterfeit checks at Wal-Mart stores. All three pled guilty to two counts: conspiracy to utter counterfeited securities, to knowingly possess five or more false identification documents with intent to use them unlawfully, and to commit aggravated identity theft (Count 1), *see* 18 U.S.C.

1

§ 371; and aggravated identity theft (Count 3), *see* 18 U.S.C. § 1028A(a)(1).  Spigner and Stubblefield also pled guilty to one count of knowingly possessing five or more false identification documents with intent to use them unlawfully (Count 2), *see* 18 U.S.C. § 1028(a)(3).  The charges arose from evidence uncovered during a search of the appellants' vehicle for narcotics.  That search revealed, among other things, 20 different false Texas driver's licenses with pictures of Stubblefield and Spigner and 39 counterfeit checks payable to the names on those licenses.  The appellants all sought to have this evidence suppressed, but the district court denied their motions.

Earvin and Spigner appeal the denial of their suppression motions.  Stubblefield appeals the procedural reasonableness of his sentence.  For the reasons set forth below, we **AFFIRM** the judgment of the district court with respect to Earvin and Spigner, **VACATE** the judgment with respect to Stubblefield's sentence, and **REMAND** his case for resentencing.

## I. BACKGROUND

In July 2009, Officer Michael Gerardi pulled over a speeding rental car near Cleveland, Ohio that was driven by Earvin.  Stubblefield and Spigner were passengers.  Patrolman Ours backed up Gerardi during the traffic stop.  While Ours explained the speeding ticket to Earvin, Gerardi deployed his drug-detection dog Arrow.  Arrow alerted to the presence of drugs and the police then searched the car for drugs.

The police found over $700 in cash and a sealed envelope that bore a return address and name that did not match the names of any of the individuals in the car.  Inside the envelope, the police found 10 false Texas driver's licenses with either Stubblefield's or Spigner's picture; 20 Chase Bank checks payable to the names on the driver's licenses; and maps and addresses of Wal-Mart stores located near Dayton and Columbus, Ohio.

The police arrested the car's occupants and towed the car to the station so the police could continue their search away from the freeway. During the continued search, the police found another envelope containing nine more false Texas driver's licenses,

five with Spigner's picture and four with Stubblefield's; nineteen counterfeit checks that matched the names on the false driver's licenses; two Internet printouts of maps of Wal-Mart stores located near Cleveland, Ohio; and a list of 30 names, social security numbers, Texas driver's license numbers, and birth dates of actual Texas residents.

In October 2009, a federal grand jury indicted Stubblefield, Spigner, and Earvin. All three defendants filed motions to suppress. The district court held a suppression hearing and denied the motions. The defendants then entered into written plea agreements whereby Stubblefield and Spigner pled guilty to Counts 1-3 and Earvin pled guilty to Counts 1 and 3.

The Presentence Report (PSR) recommended a two-level enhancement to the United States Sentencing Guidelines offense level because each Wal-Mart store affected was treated in the PSR as a separate victim for purposes of the Guidelines § 2B1.1(b)(2) number-of-victims enhancement. That two-level enhancement corresponded to more than 10 but fewer than 50 victims. U.S.S.G. § 2B1.1(b)(2). Both Stubblefield and Spigner contended at sentencing that the sole victim was the Wal-Mart corporation and thus objected to this enhancement. But the district court applied it, reasoning that because the individual stores first take a loss, each is a victim even though all are ultimately reimbursed by the Wal-Mart corporation. Accordingly, Stubblefield was principally sentenced to 54 months' imprisonment; Spigner, to 42 months' imprisonment; and Earvin, to 61 months' imprisonment. Each defendant was ordered to pay $68,742 in restitution to the Wal-Mart corporation.

On appeal, Earvin and Spigner challenge only the district court's denial of their motion to suppress the evidence. Although Spigner challenged the number-of-victims enhancement before the district court expressly to preserve the issue for appeal, Spigner does not raise that issue here. Stubblefield is the only defendant to challenge on appeal the procedural reasonableness of his sentence based on the number-of-victims enhancement that the district court applied.

## II. ANALYSIS

### A.     Motion to Suppress

In reviewing a district court's decision on a motion to suppress evidence, we review the district court's factual findings under a clear-error standard and its legal conclusions de novo. *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). If the district court denied the motion to suppress, then we must "view the evidence in the light most favorable to the government." *United States v. Smith*, 549 F.3d 355, 359 (6th Cir. 2008)

Earvin argues that the evidence against him must be suppressed for the following reasons: (1) the traffic stop's duration was unreasonably extended by deploying the drug-detection dog; (2) the drug-detection dog's reliability was not properly established; (3) the dog's alert did not justify opening the envelope containing the first set of counterfeit documents; (4) those documents did not justify arresting Earvin; and (5) the towing and continued search of the car without a warrant was not justified. We consider each argument in turn below.

The Fourth Amendment to the U.S. Constitution prohibits unreasonable searches and seizures. "Stopping a vehicle and detaining its occupants amounts to a seizure under the Fourth Amendment." *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008) (internal quotation marks omitted). The reasonableness of a traffic-stop seizure depends on (1) whether the stop was justified at its inception and (2) whether the scope and duration of the stop was reasonably related to the circumstances that justified the stop initially. *Id.* at 582-83 (citing *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)). Although Earvin concedes that the traffic stop was initially justified, he contends that the stop's duration was unreasonably extended by deploying the drug-detection dog.

An officer may not detain a car's occupants longer than reasonably necessary to complete the purpose of the stop unless the officer develops reasonable, articulable suspicion of additional criminal activity. *Bell*, 555 F.3d at 541; *United States v. Davis*, 430 F.3d 345, 353-54 (6th Cir. 2005). But an officer who lacks reasonable, articulable

suspicion may nevertheless use a drug-detection dog if the traffic stop and detention are lawful and not improperly extended. *Bell*, 555 F.3d at 539 (citing *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005)). The officers in *Bell* pulled Bell over for speeding and, while waiting for the results of a computer check on Bell's license, radioed for a drug-detection dog to come to the scene. *Id.* at 536-37. Once the officers received the results of the background check, one of the officers "decided to issue a warning and then almost immediately walked back to Bell's car and began writing the warning and discussing it with Bell." *Id.* at 542. While doing so, the officer had Bell exit his car so that the dog, which had arrived, could sniff the car. *Id.* at 537-38. This Court held that the sniff was permissible "[b]ecause the measures taken to enable the dog sniff did not improperly extend Bell's detention or cause [the officers] unreasonably to deviate from investigation of the speeding offense." *Id.* at 543.

The district court in the present case found that deploying the drug-detection dog did not "prolong the time necessary to complete the traffic ticket." And the record shows that the district court did not clearly err in making this finding. Gerardi is a canine officer who travels with his dog Arrow. After obtaining Earvin's license and rental agreement, Gerardi returned to his patrol car, wrote a speeding ticket, and immediately gave it to Patrolman Ours for Ours to explain it to Earvin and get Earvin's signature. Earvin exited the car and Gerardi immediately deployed Arrow, who alerted to the presence of drugs by scratching at the passenger-side front door. Less than five minutes passed between Gerardi's asking Earvin for identification and Ours's issuing the ticket. Moreover, Gerardi testified that the dog sniff did not delay issuing the citation. Because deploying the dog did not improperly extend the lawful traffic stop, Earvin's first argument for suppressing the evidence is unpersuasive. *See Bell*, 555 F.3d at 539, 543.

Earvin next argues that the drug-detection dog's reliability was not properly established. We uphold a district court's findings regarding the training and reliability of a drug-detection dog unless those findings are clearly erroneous. *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994). A dog's training and reliability can be

established by the testimony of the dog's handler alone. *Id.* at 396. If the evidence adduced,

> whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the "credibility" of the dog. Lack of additional evidence, such as documentation of the exact course of training, similarly would affect the dog's reliability. As with the admissibility of evidence generally, the admissibility of evidence regarding a dog's training and reliability is committed to the trial court's sound discretion.

*Id.* at 394.

The district court found that Arrow was certified as a drug-detection dog, that Arrow underwent extensive training to get this certification, that Gerardi's testimony that Arrow was 90% accurate was believable, and that this evidence established that Arrow was properly trained and reliable. The record provides more than enough evidence to conclude that the district court did not clearly err in making these findings. Gerardi testified at the suppression hearing that he began training with Arrow in September 2005; that Arrow was trained to detect the odors of marijuana, cocaine, heroin, and methamphetamine; that in order for Arrow to become certified to detect a particular drug, he was required to pass a test; that passing required successfully alerting on four to six targets containing that particular drug amidst targets that did not contain the drug, with one miss per odor allowed (including false alerts); that Arrow was certified by the State of Ohio in October 2005 and 2007 in both patrol work and drug detection; that the 2007 certifications were good for two years and thus applied on the date of the stop in question; that Arrow's alerts in the past where no drugs were found (hereafter, "unconfirmed alerts")—including 22 such alerts between January 2008 and October 2009—do not indicate that Arrow is unreliable; that unconfirmed alerts by Arrow are not necessarily false alerts because Arrow can detect an odor of narcotics in places where narcotics were previously; and that based on Gerardi's experience, drugs are found 90% of the time Arrow alerts. The government also introduced copies of Arrow's certificates into the record.

In the face of this evidence and the deference given to the district court's findings regarding Arrow's reliability and training, Earvin's arguments to the contrary are unpersuasive. As Earvin points out, Gerardi did not maintain complete records tracking each time Arrow was deployed in the field. But the reliability of a drug-detection dog can be established through the testimony of the dog's handler alone. *Diaz*, 25 F.3d at 394. And the district court specifically credited Gerardi's testimony that Arrow was reliable and alerted accurately 90% of the time. Although Earvin correctly points out that no drugs were discovered in Earvin's rental car following Arrow's positive alert, this fact is not dispositive. The crucial question for reliability is not whether a dog is actually correct in the specific instance at hand—no dog is infallible—but rather whether the dog is likely enough to be right so that a positive alert "is sufficient to establish probable cause for the presence of a controlled substance." *Diaz*, 25 F.3d at 394. "This court has defined probable cause as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is said to exist when there is a fair *probability*, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Howard*, 621 F.3d 433, 453 (6th Cir. 2010) (internal quotation marks omitted) (emphasis added).

Because Arrow's reliability and proper training have been established, Earvin's next argument—that Arrow's alert did not justify opening the envelope containing the first set of counterfeit documents—is easily dismissed. An alert by a properly trained and reliable drug-detection dog "is sufficient to establish probable cause for the presence of a controlled substance." *Diaz*, 25 F.3d at 394. If the police have probable cause to search a lawfully stopped vehicle for contraband, then the police have probable cause to search every part of the vehicle and all containers found therein in which the object of the search could be hidden. *United States v. Crotinger*, 928 F.2d 203, 205 (6th Cir. 1991) (citing *United States v. Ross*, 456 U.S. 798, 824 (1982)). So Arrow's alert gave the officers probable cause to search the car and any containers capable of hiding drugs.

During the resulting search, Gerardi discovered over $700 in currency in the center console and a legal-size envelope in luggage in the backseat that was addressed

to an attorney in Texas with a return address and name that did not match the names of any individuals in the vehicle. The envelope was too heavy for the affixed postage. Gerardi felt the envelope and believed that it could contain black-tar heroin, a form of heroin that Gerardi testified could be "rolled out flat and put in an envelope." So Gerardi had probable cause to search the envelope because he believed that it could contain drugs. *See Crotinger*, 928 F.2d at 205. Earvin's argument therefore fails.

Earvin next contends that the envelope's contents did not provide justification for the police to arrest him.[1] To determine whether the police had probable cause to arrest Earvin, this Court "must determine whether at that moment the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that a suspect had committed or was committing an offense." *Smith*, 549 F.3d at 359 (brackets and internal quotation marks omitted). The facts and circumstances are "viewed from the standpoint of an objectively reasonable police officer." *United States v. Romero*, 452 F.3d 610, 615 (6th Cir. 2006) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "While probable cause means that officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt." *Romero*, 452 F.3d at 616. But "the belief of guilt must be particularized with respect to the person to be searched or seized." *Id.* (quoting *Pringle*, 540 U.S. at 371) (brackets omitted).

When Gerardi opened the envelope, he found 10 false Texas driver's licenses with different names and different driver's license numbers, five with Stubblefield's picture and the other five with Spigner's. He also found 20 Chase Bank checks payable to the names on the driver's licenses and Internet printouts of maps and addresses of

---

[1] Earvin and the government disagree on whether Earvin was arrested following the discovery of the counterfeit identifications and checks in the first envelope. Although Gerardi's testimony suggests that Earvin was arrested, his testimony could possibly be read as suggesting that Earvin was merely detained while further investigation was conducted. But we do not need to decide this issue. Because the officers possessed probable cause to arrest Earvin, they also possessed the lesser power to continue to detain him. We therefore analyze the issue as if Earvin were arrested, which imposes a higher burden on the police than if Earvin were merely detained.

Wal-Mart stores located near Dayton and Columbus, Ohio. Besides the contents of the envelope and the $700 cash in the center console, Gerardi knew that the rental car was in only Earvin's name and that neither Spigner nor Stubblefield was an authorized driver. Finally, Earvin, Spigner, and Stubblefield all gave inconsistent answers as to why they were visiting the area.

Based on these facts, a reasonable police officer would have been justified in concluding that all three men were likely involved in some type of fraudulent check-cashing scheme. The passengers each had multiple false driver's licenses and multiple (likely false) checks made out to names on those licenses. There was a large amount of cash in the car, and an officer could reasonably infer from its placement in the center console and its jumbled condition that it was the shared spoils of the three men's joint criminal enterprise. Moreover, only Earvin was authorized to drive the rental car, and the maps and addresses of numerous Wal-Mart stores in a concentrated area suggested that the car was being used to transport the passengers to places where they could cash the checks. A reasonable officer would therefore have had probable cause to arrest all three men.

The fact that the uncovered evidence pointed to fraud rather than drugs is irrelevant. The officers had probable cause to search the car because of Arrow's alert for the presence of drugs, but once they found clear evidence of fraud, they had probable cause to arrest the three men for those crimes.

Earvin's final argument is that the towing and continued search of the car without a warrant was not justified. But in *Chambers v. Maroney*, 399 U.S. 42, 51-52 (1970), the Supreme Court held that if police officers had probable cause to search a vehicle that had been stopped on the road for contraband, then the officers may transport the car to the police station and search the vehicle without a warrant. The Court reasoned that the vehicle "was a fleeting target for a search" and that a search of the vehicle on the road "was impractical and perhaps not safe for the officers." *Id.* at 51-52. In the present case, the officers had probable cause to search the vehicle for more evidence of check-cashing fraud (because of the envelope) and drugs (because of Arrow's alert). Moreover,

Gerardi testified that he had the car towed to the police station to complete the search there because the side of the freeway where the police were conducting the search was too narrow.  Because the reasons underlying the Court's decision in *Chambers* are also present in this case, the officers could validly continue to search the rental car without a warrant after towing it to the police station.  And this search turned up an open envelope containing nine more false Texas driver's licenses, five with Spigner's picture and four with Stubblefield's; nineteen counterfeit checks that matched the names on the false driver's licenses; two Internet printouts of maps of Wal-Mart stores located near Cleveland, Ohio; and a list of 30 names, social security numbers, Texas driver's license numbers, and birth dates of actual Texas residents.[2]

Because Earvin's arguments for suppressing the evidence obtained from the search and seizure in this case are unpersuasive, we affirm the denial of Earvin's motion to suppress.

Spigner also challenges the denial of his motion to suppress, but the government contends that he lacks standing to make this challenge.  Assuming without deciding that Spigner has standing, Spigner's arguments on the merits are unpersuasive because his arguments are subsumed in Earvin's.  Spigner argues that the traffic stop was unreasonably extended by deploying the drug-detection dog, that the drug-detection dog was unreliable, and that the dog's alert did not justify opening the envelope containing the first set of counterfeit documents.  Those arguments fail for the same reason they fail for Earvin.  Therefore, we also affirm the denial of Spigner's motion to suppress.

**B.     Stubblefield's sentencing enhancement for multiple victims under Guidelines § 2B1.1(b)(2)**

The final issue is whether the district court erred in concluding that each separate Wal-Mart store constituted a victim for purposes of the Guidelines § 2B1.1(b)(2) number-of-victims enhancement.  Stubblefield argues that the only victim under

---

[2]A fifth false driver's license with Stubblefield's picture was found in his wallet.

§ 2B1.1(b)(2) is the Wal-Mart corporation and that the district court's sentence is therefore procedurally unreasonable.

This Court reviews criminal sentences for both substantive and procedural reasonableness. *Gall v. United States*, 552 U.S. 38, 51 (2007). "Reasonableness is determined under the deferential abuse-of-discretion standard." *United States v. Battaglia*, 624 F.3d 348, 350 (6th Cir. 2010). In determining procedural reasonableness, one factor this Court assesses is "whether the district court properly calculated the Guidelines range." *Id.* at 350-51. If the district court misinterprets the Guidelines or miscalculates the Guidelines range, then the resulting sentence is procedurally unreasonable. *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007). "The court's legal interpretation of the Guidelines are reviewed de novo, but its factual findings are reviewed under the clearly erroneous standard." *Battaglia*, 624 F.3d at 351. "Whether a person is a victim under the Sentencing Guidelines is a legal conclusion [that appellate courts] review de novo." *United States v. Ellisor*, 522 F.3d 1255, 1275 (11th Cir. 2008) (italics and internal quotation marks omitted). And the government bears the burden to "prove, by a preponderance of the evidence, that a particular sentencing enhancement applies." *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003).

Section 2B1.1(b)(2) of the Guidelines provides as follows:

(Apply the greatest) If the offense—

(A)     (i) involved 10 or more victims; or (ii) was committed through mass-marketing, increase by 2 levels;

(B)     involved 50 or more victims, increase by 4 levels; or

(C)     involved 250 or more victims, increase by 6 levels.

Application Note 1 to § 2B1.1 defines *victim* thus: "any person who sustained any part of the actual loss determined under subsection (b)(1) . . . . 'Person' includes individuals, corporations, companies, associations, firms, parternships, societies, and joint stock companies." *Actual loss* in turn "means the reasonably forseeable pecuniary harm that

*resulted* from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i) (emphasis added). *Pecuniary harm* "means harm that is monetary or that otherwise is readily measurable in money." *Id*. cmt. n.3(A)(iii).

The evidence adduced at sentencing in the present case establishes that although the individual Wal-Mart stores take an initial, temporary loss, the Wal-Mart corporation ultimately bears the loss from Stubblefield's crimes. Probation Officer Allen Gold, the only person to testify at sentencing who had spoken to representatives of Wal-Mart, testified that the corporation "do[es] reimburse each store, but each store will first take the loss." The PSR that Gold prepared similarly states that "[u]limately, due to accounting practices of the Wal-Mart Corporation and the corporate guarantee to individual stores that payroll checks will be covered, the Corporation reimburses the individual stores for their losses." Because the evidence does not suggest that the reimbursement hinges on any conditions, the stores' loss is necessarily temporary, which is another way of saying that reimbursement is automatic.[3] Moreover, the judgment requires Stubblefield to pay his restitution to the corporation rather than the individual stores. These facts support the conclusion that only the corporation suffers an actual loss—i.e., the "pecuniary harm that *resulted from the offense*," U.S.S.G. § 2B1.1 cmt. n.3(A)(i) (emphasis added). So the only victim is the corporation, and the district court erred in applying an enhancement based on the number of stores affected.

This conclusion is supported by controlling caselaw. This Court first analyzed the meaning of *victim* in § 2B1.1(b)(2) in *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005). In that case, Yagar orchestrated a bank-fraud scheme where she used stolen checks to deposit money into the accounts of others and then withdrew a portion of that money. *Yagar*, 404 F.3d at 968. The Court analyzed whether "account holders who only temporarily lost funds resulting from Yagar's conduct because their banks

---

[3]The government argues that stores are reimbursed only if they follow proper procedures. But no evidence supports this claim. To be sure, the government attorney at sentencing claimed that stores must follow proper procedures to be reimbursed. But the attorney offered no evidence to support this claim, expressly acknowledged that he had not spoken with Wal-Mart representatives, and deferred to Gold to explain the particulars of how Wal-Mart handles the loss. Gold, who had spoken with Wal-Mart, not only never stated that reimbursement depended on following proper procedures, but consistently characterized reimbursement as something that just happens.

reimbursed them for their losses" were victims under § 2B1.1(b)(2). *Id.* at 971. Although the government argued that the reimbursement was irrelevant because the Guidelines provide "no limitation as to when the actual loss must exist," the Court disagreed and held that the account holders were not victims under § 2B1.1(b)(2) "because they were fully reimbursed for their temporary financial losses." *Id.* In such circumstances, there was no *actual loss* or *pecuniary harm* as required by the Guidelines. *Id.* The Court reasoned that there may be cases in which a person who is ultimately reimbursed is deemed a victim, but *Yagar* was not such a case because "the account holders . . . suffered no adverse effect as a practical matter from Yagar's conduct." *Id.* In support of its conclusion, the Court reasoned that the definition of *actual loss*—which the Guidelines require in order to be a victim—uses the past tense: "the loss has to be defined by what *resulted from the offense*." *Id.* (ellipses omitted) (emphasis added).

The Wal-Mart stores, like the account holders in *Yagar*, suffered only a temporary loss that was fully reimbursed. The adverse practical effect of Stubblefield's actions—monetary loss—is borne by the corporation. No evidence was presented that the stores themselves suffer an adverse impact distinct from the loss that the corporation ultimately bears.

The conclusion that the Wal-Mart stores should not be deemed victims under the logic of *Yagar* is strengthened by *United States v. Erpenbeck*, 532 F.3d 423 (6th Cir. 2008). *Erpenbeck* involved a developer of homes and condominiums whose bank fraud included selling property without using the sale proceeds to make the appropriate payments to the construction lender. This left homeowners with construction liens on their property that should have been discharged. *Erpenbeck*, 532 F.3d at 426-27. The homeowners initiated a class-action lawsuit and eventually obtained a settlement that paid off their liens. *Id.* at 442. This Court interpreted *Yagar* as recognizing that there may be situations in which a person who is ultimately reimbursed is nonetheless deemed a victim (hereafter, the *Yagar* exception) and reasoned that the homeowners fit the exception and were victims under the Guidelines. *Id.* Thus, application of the exception turned on whether the loss was necessarily temporary. A customer of a bank or a credit-

card company, such as the account holders in *Yagar,* are "generally protected [against fraud] by an agreement that the bank or company will handle any fraud based upon unauthorized charges against the customer's account. . . . As *Yagar* points out, a loss under this type of contractual arrangement is *necessarily temporary* and the customers are fully reimbursed." *Id.* (emphasis added). The homeowners' loss, on the other hand, was not necessarily temporary. Nor was their reimbursement automatic: "most . . . had to undertake a class-action lawsuit to seek relief." *Id.* Because the Wal-Mart stores' loss is necessarily temporary and there is no evidence that they need to take action to be reimbursed, the stores are analogous to the account holders in *Yagar* and distinguishable from the homeowners in *Erpenbeck.* So controlling precedent weighs in favor of concluding that the stores are not victims under § 2B1.1(b)(2).

This conclusion is also buttressed by the most factually analogous case, *United States v. Icaza*, 492 F.3d 967 (8th Cir. 2007). *Icaza* involved thieves who stole over-the-counter medicines from approximately 407 Walgreens stores. *Icaza*, 492 F.3d at 968-69. The Walgreens representative testified at sentencing that the individual stores "have taken their loss, but ultimately the corporation takes the loss." *Id.* at 969. Even though the Walgreens stores take the loss initially, the Eighth Circuit held that the only victim was the Walgreens corporation because it ultimately "sustained the actual loss." *Id.* (quoting U.S.S.G. § 2B1.1 cmt. n. 1) (ellipses omitted). The testimony of the Walgreens representative mirrors the evidence presented by Probation Officer Gold, who spoke to Wal-Mart. Individual stores first take the loss, but ultimately the corporation bears the loss. The government attempts to distinguish *Icaza* by arguing that the reimbursement there (a restocking of stolen inventory) is automatic whereas the reimbursement of Wal-Mart stores is not. But this distinction is untenable because the evidence suggests that the reimbursement of individual Wal-Mart stores by the corporation is automatic.

The government's other arguments are unpersuasive as well. First, the government argues that the credit-against-loss commentary (§ 2B1.1 cmt. n.3(E)) implies that someone who suffered an initial loss but is later reimbursed still has suffered a loss and is thus a victim. But as the Fifth and Tenth circuits recognize, calculating *loss* under

§ 2B1.1 is a "distinct concept" from identifying *victims* under § 2B1.1. *United States v. Conner*, 537 F.3d 480, 491 n.38 (5th Cir. 2008); *accord United States v. Orr*, 567 F.3d 610, 616 (10th Cir. 2009). This Court "should not look to a separate provision of the Application Notes to create an ambiguity in the provisions relevant to defining 'victim,' when no ambiguity exists when looking at those provisions alone." *Orr*, 567 F.3d at 616 (quoting *Conner*, 537 F.3d at 491 n.38). Moreover, the government's argument that the credit-against-loss commentary supports its position hinges upon the concepts *initial loss* and *loss*, but the definition of *victim* in § 2B1.1 cmt. n.1 turns instead on *actual loss*. *See id.*

The government next argues that the definition of *victim* specifies no temporal limitation on when the actual loss must exist. But *Yagar* rejected this precise argument: the government "claims that the fact that the account holders were subsequently reimbursed . . . should not matter because under the Guidelines 'there is no limitation as to when the actual loss must exist.' . . . We disagree." *Yagar*, 404 F.3d at 971 (brackets omitted).

Finally, the government points to four circuits that have held that people who are reimbursed are still victims under § 2B1.1(b)(2). But the facts in three of these cases fall within the *Yagar* exception; these cases are therefore consistent with holding that the Wal-Mart stores are not victims for purposes of § 2B1.1(b)(2). *See United States v. Pham*, 545 F.3d 712, 716, 719-21 (9th Cir. 2008) (reasoning that account holders who were fully reimbursed but who had to spend an appreciable amount of time and effort to secure reimbursement were victims); *United States v. Abiodun*, 536 F.3d 162, 168-170 (2d Cir. 2008) (holding that credit-card holders who were fully reimbursed but who had to spend an appreciable amount of time and effort to secure reimbursement could be victims if the monetary value of that time and effort was also included in the loss calculation); *United States v. Lee*, 427 F.3d 881, 895 (11th Cir. 2005) (holding that the creditors were victims despite being reimbursed when the creditors themselves had to sue to obtain reimbursement and in some cases obtained only partial reimbursement).

And the fourth case, though fully at odds with *Yagar*'s reasoning, is not controlling in this circuit. *United States v. Stepanian*, 570 F.3d 51, 55-56 (1st Cir. 2009).

Because the controlling precedent weighs in favor of concluding that the Wal-Mart stores are not victims under § 2B1.1(b)(2) and because the government's arguments to the contrary are not persuasive, the district court erred in counting the individual stores as victims and applying a two-level enhancement on that basis. We therefore vacate Stubblefield's sentence and remand his case for resentencing.

### III. CONCLUSION

For all of the above reasons, we **AFFIRM** the judgment of the district court with respect to Earvin and Spigner, **VACATE** the judgment with respect to Stubblefield's sentence, and **REMAND** his case for resentencing.