[Cite as *State v. Spratley*, 2021-Ohio-262.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO.  8-20-13

    v.

LAVELLE T. SPRATLEY,              O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court
Trial Court No. CR 19 08 0243

**Judgment Affirmed**

**Date of Decision:   February 1, 2021**

APPEARANCES:

    *Alison Boggs* **for Appellant**

    *Eric C. Stewart* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Lavelle T. Spratley ("Spratley"), appeals the April 16, 2020 judgment of sentence of the Logan County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} On the evening of July 6, 2019, Lieutenant Michael Thompson ("Lieutenant Thompson") of the Washington Township Police Department was on traffic patrol duty near Indian Lake in Logan County, Ohio. Lieutenant Thompson, who is the canine handler for the Washington Township Police Department, was on duty with his police dog, Bruno. At around 8:53 p.m., Lieutenant Thompson stopped a tan Honda that was emitting unusually loud noises from its exhaust system. The vehicle was driven by Tyshawn Thompson ("Tyshawn"). Spratley, the other occupant of the vehicle, was seated in the front passenger seat. At approximately 8:55 p.m., Lieutenant Thompson approached the Honda and established contact with Spratley and Tyshawn. Lieutenant Thompson asked Tyshawn to produce his identification, registration, and proof of insurance. Lieutenant Thompson also requested that Spratley provide identification. However, Spratley and Tyshawn refused to provide identification until Lieutenant Thompson told them why the vehicle had been stopped.

{¶3} Spratley and Tyshawn refused several additional demands for their identifications, which prompted Lieutenant Thompson to call for backup. Minutes

later, Officer Earl Wisener ("Officer Wisener") and Chief Rick Core ("Chief Core") arrived to support Lieutenant Thompson. By the time Officer Wisener and Chief Core arrived, Lieutenant Thompson had been trying to identify Spratley and Tyshawn for nearly four minutes. Once Officer Wisener and Chief Core were on the scene, Lieutenant Thompson instructed Tyshawn to exit the vehicle. Tyshawn eventually complied with Lieutenant Thompson's order and exited the vehicle at approximately 8:59 p.m. As Lieutenant Thompson spoke to Tyshawn, Officer Wisener watched Spratley, who remained inside of the vehicle.

{¶4} When Tyshawn exited the Honda, Lieutenant Thompson told him why the vehicle had been stopped. Once Tyshawn was informed of the reason for the stop, he gave his social security number to Lieutenant Thompson, who provided the number to a dispatcher. Just before 9:01 p.m., the dispatcher informed Lieutenant Thompson of Tyshawn's name and of the fact that Tyshawn did not have a valid driver's license. Upon learning that Tyshawn was not properly licensed, Lieutenant Thompson went to ask Spratley whether he had a valid driver's license. Spratley, who had not yet given Lieutenant Thompson any form of identification, stated that he had already told Lieutenant Thompson that he did not have a license. In addition, when Officer Wisener asked Spratley whether he had a valid driver's license, Spratley responded, "No, I don't have a driver's license." (State's Ex. 1). Thus, as of approximately 9:02 p.m., it appeared that neither Spratley nor Tyshawn was

capable of legally operating the Honda. According to Lieutenant Thompson, in circumstances where the driver and the occupants of a stopped vehicle do not possess valid driver's licenses, the ordinary procedure is to impound the vehicle. (Jan. 22, 2020 Tr. at 47-48). However, because Tyshawn's girlfriend, the registered owner of the vehicle, was nearby, Lieutenant Thompson agreed to release the vehicle to her. Consequently, Tyshawn contacted his girlfriend and told her to come pick up the vehicle.

{¶5} At around 9:04 p.m., Lieutenant Thompson asked for Tyshawn's permission to search the Honda. Tyshawn refused to give consent to search. Having been denied consent to search, Lieutenant Thompson decided to retrieve Bruno from his patrol vehicle in order to conduct an exterior sniff of the Honda. At approximately 9:06 p.m., Lieutenant Thompson began walking Bruno around the exterior of the Honda. When Bruno reached the front passenger-side door, he alerted to the presence of drugs in the vehicle.

{¶6} After Bruno alerted to the presence of drugs, Officer Wisener opened the Honda's front passenger-side door and demanded that Spratley exit the vehicle. Although Spratley had been argumentative with Lieutenant Thompson and Officer Wisener throughout the course of the traffic stop, he grew increasingly agitated and uncooperative as he was ordered out of the vehicle. Eventually, after Spratley had ignored numerous commands to exit the vehicle, Lieutenant Thompson told

Spratley that he was under arrest. Even then, Spratley persisted in refusing to exit the vehicle, and Lieutenant Thompson and Officer Wisener were required to reach into the vehicle to physically remove Spratley. Once they brought Spratley outside of the Honda, they attempted to handcuff him. However, Spratley resisted, and they were forced to tackle him to the ground. After a while, Lieutenant Thompson and Officer Wisener succeeded in handcuffing Spratley, and during a search incident to his arrest, they found his wallet. Upon locating Spratley's identification inside of the wallet, they were finally able to establish Spratley's identity. After radioing Spratley's information to the dispatcher, the dispatcher confirmed that Spratley did not have a valid driver's license. Spratley was then placed in the back of Officer Wisener's patrol vehicle.

{¶7} Lieutenant Thompson and Officer Wisener then proceeded to search the Honda. During the search, Officer Wisener observed what he believed to be marijuana residue on the passenger-side floorboard. However, the substance was not collected for later analysis. In addition, Officer Wisener found a loaded 9 mm handgun in the glovebox. Later, as Spratley was being transported to the Logan County Jail in Officer Wisener's patrol vehicle, Spratley volunteered that he was the owner of the handgun and that he had purchased it at a pawnshop in Tennessee.

{¶8} After the search of the Honda was completed and Spratley was taken from the scene, Lieutenant Thompson waited with Tyshawn for Tyshawn's

girlfriend to take custody of the vehicle. At approximately 9:47 p.m., Tyshawn's girlfriend, who had gotten lost en route to the traffic stop, arrived at the scene. Shortly thereafter, Tyshawn was permitted to leave in the Honda with his girlfriend. Tyshawn was not issued any citations in connection with the traffic stop.

{¶9} On August 13, 2019, the Logan County Grand Jury indicted Spratley on three counts: Count One of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B), a fourth-degree felony; Count Two of obstructing official business in violation of R.C. 2921.31(A), a second-degree misdemeanor; and Count Three of resisting arrest in violation of R.C. 2921.33(A), a second-degree misdemeanor. (Doc. No. 1). On October 21, 2019, Spratley appeared for arraignment and pleaded not guilty to the counts of the indictment. (Doc. No. 16).

{¶10} On December 24, 2019, Spratley filed a motion to suppress evidence. (Doc. No. 41). In support of his motion, Spratley argued that neither Lieutenant Thompson nor Officer Wisener had reasonable suspicion to extend the traffic stop for purposes of deploying Bruno to sniff around the Honda. (*Id.*). Spratley maintained that he was therefore unlawfully seized and that the handgun discovered during the course of the subsequent search was the fruit of the unlawful seizure. (*Id.*). Furthermore, Spratley claimed that his statements admitting ownership of the handgun were obtained in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (*Id.*).

{¶11} A hearing on Spratley's motion to suppress evidence was held on January 22, 2020. On the day of the hearing, the State filed its memorandum in opposition to Spratley's motion to suppress. (Doc. No. 46). On January 30, 2020, the State filed a supplemental memorandum in response to Spratley's motion to suppress. (Doc. No. 51). Spratley filed responses to the State's memoranda on January 31, 2020, and on February 3, 2020. (Doc. Nos. 52, 53).

{¶12} On February 5, 2020, the trial court denied Spratley's motion to suppress evidence. (Doc. No. 54).

{¶13} A change of plea hearing was held on February 28, 2020. At the change of plea hearing, Spratley withdrew his previous pleas of not guilty and pleaded no contest to all counts of the indictment. (Doc. No. 72). The trial court accepted Spratley's no-contest pleas and found him guilty. (*Id.*). On April 15, 2020, the trial court sentenced Spratley to 21 days in the Logan County Jail on each of Counts One through Three. (Doc. No. 76). The trial court ordered that these jail terms be served concurrently for an aggregate term of 21 days in the Logan County Jail. (*Id.*). The trial court filed its judgment entry of sentence on April 16, 2020. (*Id.*).

{¶14} On April 21, 2020, Spratley filed a notice of appeal. (Doc. No. 84). He raises one assignment of error for our review.

**Assignment of Error**

**The trial court erred when it denied appellant's suppression motion.**

{¶15} In his assignment of error, Spratley argues that the trial court erred by denying his motion to suppress evidence. Spratley argues that Lieutenant Thompson violated his Fourth Amendment rights by unreasonably prolonging the traffic stop. He maintains that the traffic stop should have ended at or near the time that Lieutenant Thompson learned that there were no validly licensed drivers in the Honda because, by that time, Lieutenant Thompson had all the information he needed to either arrest Tyshawn, give him a citation, or release him with a warning. (Appellant's Brief at 8). Spratley contends that rather than ending the traffic stop in any of these ways, Lieutenant Thompson instead chose to extend the stop for the sole purpose of deploying Bruno—an investigative step not "reasonably related" to the initial justification for the stop. Spratley maintains that because the extension of the stop had no rational relation to Lieutenant Thompson's "traffic mission," Lieutenant Thompson needed to have a reasonable, articulable suspicion of additional criminal activity, which, according to Spratley, Lieutenant Thompson did not possess.

{¶16} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is

in the best position to evaluate the evidence and the credibility of witnesses. *Id. See State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997). Because the facts of this case, as recited in the opening pages of this opinion, are not in dispute, we are concerned only with whether these facts satisfy the applicable legal standards. *See State v. Wagner*, 3d Dist. Logan No. 8-20-06, 2020-Ohio-5574, ¶ 11.

{¶17} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 7, citing *State v. Orr*, 91 Ohio St.3d 389, 391 (2001). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769 (1996), citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391 (1979), *United States v. Martinez-Fuerte*, 428 U.S. 543, 556, 96 S.Ct.

3074 (1976), and *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574 (1975). The individuals "seized" during the stop of an automobile by law enforcement officers include persons riding in the automobile as passengers. *Brendlin v. California*, 551 U.S. 249, 251, 127 S.Ct. 2400 (2007); *State v. Clark*, 6th Dist. Wood No. WD-17-025, 2018-Ohio-2029, ¶ 22, quoting *State v. Carter*, 69 Ohio St.3d 57, 63 (1994). Because an automobile stop involves the seizure of persons within the meaning of the Fourth Amendment, "[a]n automobile stop is * * * subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren* at 810. A traffic stop is reasonable, and therefore constitutionally permissible, if it is supported either by probable cause or by a reasonable, articulable suspicion that a motorist has committed, is committing, or is about to commit a crime, including a violation of the traffic laws. *State v. Moiduddin*, 3d Dist. Union No. 14-18-15, 2019-Ohio-3544, ¶ 11. However, "[w]hen police stop a vehicle without either probable cause or a reasonable articulable suspicion of criminal activity, the seizure is violative of constitutional rights and evidence derived from such a stop must be suppressed." *Clark* at ¶ 22, citing *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684 (1961).

{¶18} On appeal, Spratley does not challenge the constitutionality of the initial stop of the vehicle, and after reviewing the record, we are satisfied that Lieutenant Thompson had probable cause to stop the Honda. Instead, Spratley

argues that the traffic stop, even if lawful at its inception, ultimately violated his constitutional rights because (1) the stop was prolonged solely in order to deploy Bruno and (2) Lieutenant Thompson needed, but lacked, the reasonable, articulable suspicion necessary to prolong the stop for this purpose.

{¶19} "Both Ohio courts and the United States Supreme Court have determined that 'the exterior sniff by a trained narcotics dog to detect the odor of drugs is not a search within the meaning of the Fourth Amendment to the Constitution.'" *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, ¶ 22, quoting *State v. Grenoble*, 12th Dist. Preble No. CA2010-09-011, 2011-Ohio-2343, ¶ 30 and citing *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637 (1983). Because an exterior sniff by a trained narcotics dog is not a search, "[a] drug-detection dog may sniff around the exterior of a * * * vehicle during a lawful traffic stop in [the] absence of a reasonable suspicion of drug-related activity." *State v. Chapman*, 7th Dist. Belmont No. 18 BE 0004, 2019-Ohio-3339, ¶ 38, citing *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S.Ct. 834 (2005). Yet, without a reasonable suspicion of criminal activity beyond that which prompted the traffic stop, a law enforcement officer cannot prolong the detention for purposes of performing a dog sniff. *Rodriguez v. United States*, 575 U.S. 348, 350, 355, 135 S.Ct. 1609 (2015). For a law enforcement officer to conduct a dog sniff without a reasonable, articulable suspicion of additional criminal activity, the sniff must be

performed within the time reasonably necessary to complete the traffic-related mission of the stop. *See United States v. Stewart*, 902 F.3d 664, 671-672 (7th Cir.2018); *United States v. Stubblefield*, 682 F.3d 502, 505-506 (6th Cir.2012); *State v. Scarberry*, 10th Dist. Franklin No. 15AP-775, 2016-Ohio-7065, ¶ 25-26. Thus, in dog-sniff cases, it is imperative to define the proper scope of an officer's traffic-related mission.

{¶20} Generally, "'[w]hen an officer detains a motorist for a traffic violation, the stop should delay the motorist only for the amount of time necessary to issue a citation or warning.'" *State v. Hall*, 2d Dist. Darke No. 2016-CA-13, 2017-Ohio-2682, ¶ 8, quoting *State v. Hill*, 2d Dist. Montgomery No. 26345, 2016-Ohio-3087, ¶ 9, citing *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 12. However, "[b]eyond determining whether to issue a traffic ticket, an officer's mission [also] includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez* at 355, quoting *Caballes* at 408. "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.*, citing *Prouse*, 440 U.S. at 658-660 and 4 Wayne R. LaFave, *Search and Seizure*, Section 9.3(c), at 507-517 (5th Ed.2012). Hence, a traffic stop's mission involves both "address[ing] the traffic violation that warranted the stop and attend[ing] to related safety concerns." (Internal citation omitted.) *Id.* at 354. "Authority for the seizure

* * * ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*, citing *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568 (1985).

{¶21} Here, although Lieutenant Thompson's traffic-related mission began as a simple investigation into the Honda's faulty exhaust system, it acquired a new dimension as soon as he learned that neither Spratley nor Tyshawn had valid driver's licenses. While Lieutenant Thompson did not learn that Spratley and Tyshawn did not have valid driver's licenses until approximately nine minutes after the traffic stop was initiated, this was not Lieutenant Thompson's fault. Rather, the delay was caused by Spratley and Tyshawn's refusal to identify themselves notwithstanding Lieutenant Thompson's persistent efforts. When Lieutenant Thompson eventually learned that Spratley and Tyshawn did not have valid driver's licenses, Lieutenant Thompson was obligated to prevent them from operating the Honda. R.C. 4510.12(A)(1) ("No person * * * shall operate any motor vehicle upon a public road or highway * * * unless the person has a valid driver's license * * *."). Furthermore, because there was no one in the Honda capable of driving it away from the traffic stop, Lieutenant Thompson had to figure out how to safely dispose of the vehicle. Both of these tasks required Lieutenant Thompson to attend to safety concerns related to the traffic violation that warranted the stop. Accordingly, these tasks can be fairly characterized as part of Lieutenant Thompson's traffic-related mission, and

Lieutenant Thompson was not capable of fully accomplishing his traffic-related mission until these tasks were completed. *See United States v. Gurule*, 935 F.3d 878, 884-885 (10th Cir.2019); *United States v. Vargas*, 848 F.3d 971, 974-975 (11th Cir.2017).

{¶22} To carry out the second of the aforementioned tasks—ensuring a safe disposition of the Honda—Lieutenant Thompson elected to deviate from the department's usual impoundment procedures and allow Tyshawn's girlfriend to come retrieve the vehicle. Thus, under the facts of this case, Lieutenant Thompson's traffic-related mission could not have been completed until Tyshawn's girlfriend arrived to collect the Honda. There is nothing in the record to support that Lieutenant Thompson was not diligent in arranging for Tyshawn's girlfriend to take custody of the vehicle. To the contrary, the record reflects that Lieutenant Thompson allowed Tyshawn to make the arrangements with his girlfriend shortly after Lieutenant Thompson established that Spratley was not validly licensed. In his brief, Spratley concedes that Lieutenant Thompson "deployed [Bruno] during the wait for [Tyshawn's girlfriend]." (Appellant's Brief at 13). Therefore, the record does not support that Lieutenant Thompson prolonged the stop in order to deploy Bruno. Rather, the dog sniff occurred while Lieutenant Thompson was diligently pursuing his traffic-related mission.

**{¶23}** In sum, we conclude that contrary to Spratley's argument, Lieutenant Thompson did not prolong the traffic stop in order to deploy Bruno. Instead, any extension of the traffic stop was necessitated by Lieutenant Thompson's responsibility for preventing Spratley and Tyshawn from driving the Honda and for ensuring that the Honda was safely removed from the public roadway. *See Gurule* at 884-885 ("'What prolonged the stop was not [law enforcement's] desire to search the vehicle but the fact that [the] occupants of it could not lawfully drive it away.'"), quoting *Vargas* at 974-975. The record reflects that Lieutenant Thompson diligently discharged these responsibilities and that the dog sniff occurred within the time reasonably required for Lieutenant Thompson to complete his traffic-related mission.[1] Therefore, we conclude that the trial court did not err by denying Spratley's motion to suppress evidence.

**{¶24}** Spratley's assignment of error is overruled.

**{¶25}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**ZIMMERMAN and SHAW, J.J., concur.**

**/jlr**

---

[1] Because we conclude that Lieutenant Thompson did not prolong the traffic stop in order to conduct the dog sniff, we need not reach Spratley's argument that Lieutenant Thompson did not have a reasonable, articulable suspicion of additional criminal activity.