RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0211p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MARTIN DALE OSBORN,

*Defendant-Appellant*.

⎱ No. 21-1005

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cr-00104-1—Paul Lewis Maloney, District Judge.

Argued: July 28, 2021

Decided and Filed: September 9, 2021

Before: COLE, ROGERS, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Paul L. Nelson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Kathryn M. Dalzell, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Paul L. Nelson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Nils R. Kessler, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION

───────────────

COLE, Circuit Judge. Martin Osborn pleaded guilty to threatening to assault Congressman Henry Johnson in violation of 18 U.S.C. § 115(a)(1)(B), (b)(4), and (c)(4). At sentencing, the district court refused to apply a four-level reduction under U.S.S.G.

§ 2A6.1(b)(6) because it concluded that his offense did not "evidenc[e] little or no deliberation." In doing so, the court relied on prior threats Osborn made against other government officials that are not "relevant conduct" under U.S.S.G. § 1B1.3. But while the relevant conduct provision prohibits the district court from altering the base offense level using certain uncharged conduct, it does not alter its traditional fact-finding role. And the district court here did not clearly err in concluding that Osborn's offense evidenced more than "little or no deliberation." We therefore affirm the sentencing decision of the district court.

I.

Martin Dale Osborn is an Army veteran suffering from post-traumatic stress disorder. Around June 29, 2020, Osborn left the following voicemail for Congressman Henry Johnson from Georgia:

> Hey Johnson, you know I thought Nadler and Pelosi and Schumer were dumber than a box of rocks but I don't think you can even fit in the box. Oh and your little bill for gun control and ammunition and all that stuff. What are you stupid?
>
> Huh, you know you Democrats go ahead and keep on playing around and get a Civil war going on in this country. It's not going to be Democrats versus Republicans.
>
> I for one am coming looking for stupid asses like you. And I'm not just looking for you. You screw the American people. You screw our families over. Who do you think we're going to come after? Do you remember the Romans? What happen there when they had enough? Yeah they killed their politicians and the lawyers. Keep pushing it boy. Yeah I mean boy because there is not an ounce of man in you. You are [a] punk little bitch. And any one of you staffers working for him are nothing more. Simple-minded stupid little fucks.
>
> Yeah you know what? One day you are going to see me. It'll be about two o'clock in the morning. I'll be at your bedside and all you're going to see is me knocking the living shit out of you. You stupid arrogant little piece of shit. Terrified? You should be. Stop with the bullshit boy. Stop with [message cuts off]

The U.S. Capitol Police alerted the FBI about the voicemail, leading the FBI to send agents to Osborn's home in Michigan. In conversation with the agents, Osborn noted that he "makes all kinds of threats, all the time" but insisted that he did not have a firearm or any plans to travel to the District of Columbia or Georgia to carry out his threat against Congressman Johnson.

Indeed, this was not the first voicemail Osborn had left for a government official. First, in March 2020, Osborn left the following voicemail for Congresswoman Abigail Spanberger:

> Congresswoman Spanberger as [a] former CIA, let me tell you about your former CIA shit. The CIA has started more conflicts across this globe than any other terrorist organization. As far as you being part of the [C]entral [I]ntelligence [A]gency work conflict of terms, let you opening your mouth in talking about the terrorist leader being killed, proves your ignorance. You are the definition of a cunt, "can't understand normal thinking." You need to shut your damn mouth. If this American country knew how much bullshit the CIA started created generated throughout the globe, they would hang all you dumb fuckers. Bitch. The only thing you'll ever be successful at is spreading your fucking legs or open your mouth to take a dick. I am so sick of the CIA and the[ir] lying bullshit. One day, bitch. One day you going to get what's do [sic] you.

And second, in April 2020, Osborn left this voicemail for Senator Chris Murphy:

> Chris Murphy, I have never even heard of you until you opened your mouth on CNN and lied your ass off. What kind of bitch are you? Have you always been such a lying little snake? Have you always been such a dumb ass? Everybody in America sees this, you Democrats are pushing the whole thing and doing shady ass shit behind the scene while everyone is paying attention to Covid. I know you guys think you are going to run America, well you know what, as a veteran, there are too many of us vets, believe you me, that will turn this nation into Civil War. We will come for you, your little dotty little nose ass, is not a fucking thing you can do to stop us. See you soon Bitch.

Osborn was not charged in connection with the voicemails left to Congresswoman Spanberger or Senator Murphy.

Osborn was, however, indicted under U.S.C. § 115(a)(1)(B), (b)(4), and (c)(4) for his voicemail to Congressman Johnson. The indictment, filed in the U.S. District Court for the Western District of Michigan, alleged that Osborn threatened to assault Congressman Johnson "with intent to intimidate [him] while he was engaged in the performance of his official duties, and with intent to retaliate against him on account of the performance of his official duties." Osborn pleaded guilty to the charges in the indictment without a written plea agreement and was adjudicated guilty on September 11, 2020.

In calculating Osborn's offense level, the PSR began with a base offense level of 12 under U.S.S.G. § 2A6.1(a)(1), then applied a four-level reduction under § 2A6.1(b)(6) for an

"offense involv[ing] a single instance evidencing little or no deliberation." The PSR then increased the level by six pursuant to § 3A1.2(b) because the victim is a government official. Finally, the PSR applied a two-level reduction for acceptance of responsibility under § 3E1.1(a), bringing the total offense level back to 12. The PSR eventually recommended a custodial sentence of 10 months, the bottom of the suggested Guidelines range of 10–16 months.

Before sentencing, the government objected to the recommended four-level reduction under § 2A6.1(b)(6). It argued that Osborn's offense did not "involve[] a single instance evidencing little or no deliberation" because Osborn had also made threatening calls to Congresswoman Spanberger and Senator Murphy. In response, the Addendum notes "the probation department believed these incidents are not considered relevant conduct and therefore cannot be used in the calculation of the guideline."

At sentencing, the district court agreed with the government and refused to apply the four-level reduction. The district court held that Osborn's offense evidenced more than "little or no deliberation." The court reasoned that "when you've got two threats to two different members, and then the subject matter of the offense of conviction occurs afterwards, I'm having difficulty understanding how this becomes spontaneous, because he has done it before." Without the reduction, the offense level became 18, which entitled Osborn to a three-level (not just a two-level) reduction for acceptance of responsibility. These changes resulted in a total offense level of 15 and a Guidelines range of 18–24 months. The court, however, sentenced Osborn to serve 12 months and one day in custody, applying a downward variance.

Osborn filed a timely notice of appeal. He now argues that his sentence was procedurally unreasonable because the district court failed to properly calculate the Guidelines range when it denied him the four-level reduction under U.S.S.G. § 2A6.1(b)(6).

## II.

"If the district court misinterprets the Guidelines or miscalculates the Guidelines range, then the resulting sentence is procedurally unreasonable." *United States v. Byrd*, 689 F.3d 636, 639 (6th Cir. 2012) (quoting *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012)). We review "[l]egal conclusions regarding application of the United States Sentencing

Guidelines" de novo and factual findings for clear error. *United States v. Jackson*, 635 F.3d 205, 207 (6th Cir. 2011) (quoting *United States v. Hover*, 293 F.3d 930, 933 (6th Cir. 2002)).

Section 2A6.1(b)(6) of the Sentencing Guidelines provides that "[i]f (A) subsection (a)(2) and subdivisions (1), (2), (3), (4), and (5) do not apply, and (B) the offense involved a single instance evidencing little or no deliberation, decrease by 4 levels." The parties do not dispute that subsection (a)(2) and subdivisions (1), (2), (3), (4), and (5) do not apply. The only question left for our consideration, therefore, is whether the district court erred in concluding that "the offense involved a single instance evidencing little or no deliberation." § 2A6.1(b)(6).

A. RELEVANT CONDUCT

Osborn first contends that the district court committed legal error by considering Osborn's past threats against Congresswoman Spanberger and Senator Murphy in denying the reduction. The United States Sentencing Guidelines provide that "specific offense characteristics," such as reductions and enhancements, "shall be determined on the basis of" certain "relevant" conduct. U.S.S.G. § 1B1.3. "The goal of the relevant conduct provision is to allow a court to impose sentences commensurate with the gravity of the offense." *United States v. Kappes*, 936 F.2d 227, 229 (6th Cir. 1991). This provision is primarily expansive in nature—it allows the court to adjust the base offense level to account for certain uncharged conduct. *See id*. Indeed, the Supreme Court has described relevant conduct as a "sentencing enhancement regime[]." *Witte v. United States*, 515 U.S. 389, 403 (1995).

But relevant conduct is also limiting. It prohibits the court from adjusting the base offense level using non-relevant conduct. For example, in a drug case, a court can typically use drug quantities properly tied to the defendant but not specified in the count of conviction when determining the sentencing range. *See Edwards v. United States*, 523 U.S. 511, 513–15 (1998); *United States v. Smith*, 887 F.2d 104, 106–08 (6th Cir. 1989). By contrast, the court cannot alter the offense level using an alleged drug transaction that occurred over a year before the charged conduct without any articulable justification for the connection. *See United States v. Hill*, 79 F.3d 1477, 1484–85 (6th Cir. 1996).

The government does not dispute that the prior threats against Congresswoman Spanberger and Senator Murphy are not relevant conduct.  And we agree.  The first type of relevant conduct is "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  § 1B1.3(a)(1)(A).  Similarly, § 1B1.3(a)(3) includes harm resulting from these acts or omissions as relevant conduct.  The government has never alleged—nor would it have any basis to allege—that the prior threats occurred in the commission of, in preparation for, or in the course of attempting to avoid detection for the threat against Congressman Johnson.  For an offense where grouping is required, moreover, relevant conduct includes "all acts or omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction."  § 1B1.3(a)(2).  But § 2A6.1 is "[s]pecifically excluded from the operation of" the grouping subsection.  § 3D1.2.  And lastly, § 2A6.1 does not specify any other kind of conduct that should be considered by the court.  *See* § 1B1.3(a)(4).

Accordingly, the district court here could not have altered Osborn's offense level because of these prior threats.  For instance, as Osborn notes, the court would have erred if it applied a two-level enhancement because "the offense involved more than two threats" under § 2A6.1(b)(2)(A).  But it made no such error.  Instead, the district court made a factual finding that Osborn's threat against Congressman Johnson evidenced more than "little or no deliberation."  It concluded that "when you've got two threats to two different members, and then the subject matter of the offense of conviction occurs afterwards, I'm having difficulty understanding how this becomes spontaneous, because he has done it before."  The court therefore considered the prior threats against Congresswoman Spanberger and Senator Murphy, but only insofar as they shed light on the deliberation involved in the threat against Congressman Johnson.

Making factual determinations is a well-entrenched responsibility of the district court.  Even within the constraints of trial, the district court can consider prior acts when they may be probative of motive or intent.  Fed. R. Evid. 404(b)(2).  And the scope of facts the court may

consider at sentencing is generally broader then at trial.  *See* Fed. R. Crim. P. 32(i)(3)(A); *see also* U.S.S.G. § 6A1.3(a).  The relevant conduct provision does not constrain the district court's fact-finding role here.

Far from allowing Osborn's prior threats against Congresswoman Spanberger and Senator Murphy to become "a tail which wags the dog of the substantive offense," *Witte*, 515 U.S. at 403 (citation omitted), we conclude that the district court properly used the information it had in the record to aid in its fact-finding.

### B. DELIBERATION

Osborn also contends that the district court's finding of more than "little or no deliberation" was in clear error.   When reviewing for clear error, we "must ask whether on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020) (quoting *United States v. Orlando*, 363 F.3d 596, 603 (6th Cir. 2004)).  To the contrary, here the record supports the district court's conclusion that the offense evidenced a disqualifying amount of deliberation.

Certainly, a finding of "little" deliberation would suffice to entitle Osborn to the reduction.  But here, the record indicates that Osborn was aware that he had a pattern of calling government officials about differences in policy views and threatening them.  Within just the few months leading up to the threat against Congressman Johnson, Osborn left voicemails for both Congresswoman Spanberger and Senator Murphy that included threatening language such as "[o]ne day you going to get what's do [sic] you" and "as a veteran, there are too many of us vets, believe . . . me . . . [w]e will come for you . . . [there] is not a fucking thing you can do to stop us."  And when speaking with FBI agents, Osborn openly acknowledged that he "makes all kinds of threats, all the time."  The voicemail left for Congressman Johnson was also intimidating from the beginning, noting that Johnson should "go ahead and keep on playing around and get a Civil [W]ar going on in this country" and "I for one am coming looking for stupid asses like you."  From there, the tone of the voicemail escalates, culminating in "[o]ne day you are going to see me.  It'll be about two o'clock in the morning.  I'll be at your bedside and all you're going to see is me knocking the living shit out of you."

The district court did not clearly err in finding more than "little or no deliberation." Osborn was therefore not entitled to the four-level reduction and his sentence was procedurally reasonable.[1]

### III.

We accordingly affirm the sentencing decision of the district court.

---

[1]Application of U.S.S.G. § 2A6.1(b)(6) requires not only that the offense show little or no deliberation, but also that the instance be "single." Because we hold that the district court could consider the prior threats as part of its determination regarding prior deliberation, we have no need to address any independent meaning of the word "single." In particular, we do not address whether multiple prior threats might still keep a charged threat from being "single," even though the prior threats are not relevant conduct and the charged threat showed no prior deliberation.